# In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 04-3498

ANN S. MULLIN,

*Plaintiff-Appellant,*

*v.*

EDMOND GETTINGER, BURTON
WITTHUHN, and ERIC STIFFLER,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 00 C 1346—**Michael M. Mihm,** *Judge.*

---

ARGUED SEPTEMBER 23, 2005—DECIDED JUNE 8, 2006

---

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Ann S. Mullin sued several administrators at Western Illinois University, her employer, charging that they retaliated against her for expressing speech protected by the First Amendment. A jury returned a verdict in favor of the defendants on all counts and Mullin now challenges the judgment for the second count, claiming errors in jury instructions and in evidentiary rulings. Because she failed to prove the necessary causal link between her protected speech and the administrators' actions, we affirm the judgment.

## I.

Mullin worked as an art professor for the College of Fine Arts and Communication ("College") at Western Illinois University ("Western") from August 1967 until her March 1, 2002 retirement. In 1997, the College held student-faculty gatherings called forums at private homes. The forums provided an opportunity for members of Western's arts community to meet in an informal setting and discuss topics relevant to the arts. Although Mullin did not attend the forum held on October 28, 1997, an incident at that event eventually led to the filing of this lawsuit. At the forum, senior art student Stephanie Butts was discussing the work of a visiting artist with her professor and faculty advisor, Jan Clough. The discussion was somewhat tense, with Clough characterizing the visiting artist as a "whore in the art world." Butts sought to defend the artist by stating that all artists prostituted their work to some degree. There is considerable disagreement about what was said in this conversation but everyone agrees that it ended with Clough saying to Butts words to the effect that, "Well, okay. Then you're a whore. I paid you last week, didn't I?" Clough, who is female, apparently meant the comments in jest, and was trying to put the conversation to a friendly end. Butts took great offense at these remarks, in part because she had previously confided to Clough that she had been raped during her freshman year. She left the forum shortly thereafter. At the same event, art professor Michael Mahoney used off-color language with students who asked the professors present to be more blunt in their assessments of the students' work. According to Mahoney, the student said, "When our work is fucking shit, would you please tell us?" and Mahoney replied, "Okay, your work is fucking shit." As with the Clough-Butts exchange, there are quibbles over the exact wording, sequence and intent of these remarks, but everyone agrees that Clough called Butts a whore and Mahoney characterized a student's work as "fucking shit."

Mullin heard about the forum from other students and heard various renditions of both Clough's and Mahoney's remarks. Mullin was one of Butts' teachers that semester and several days after the forum, Butts spoke to Mullin about the event. Butts was upset and crying when she described the evening to Mullin, confiding that she felt Clough had violated her trust about the rape. Butts also told Mullin that her parents planned to see a lawyer about what had happened. After this conversation, Mullin consulted her brothers who recommended that she notify the university about the incident. Approximately three weeks after the forum, Mullin sent a letter to Edmond Gettinger, the Chair of the Art Department at Western, with a copy and cover letter to Donald Spencer, the president of the university. In the November 17, 1997 letter, Mullin reported that a student revealed to her that Clough had called the student a whore in front of other students and faculty at a forum where alcohol was consumed. Mullin also stated that other students had advised her about Mahoney's off-color remark. She said that still other students told her they had been pulled from class and told by faculty members not to talk to anyone about these matters. Mullin emphasized that she was hesitant to report these events because she was not present at the forum and thus did not have personal knowledge of what was said there. She also indicated that she lacked the resources to properly investigate what actually happened and she did not wish to adversely affect the pending tenure applications of either Clough or Mahoney. She explained that she did not know whether her description of these events was complete or accurate. She noted that these matters might expose the university to liability, that the event had been given extensive notoriety among both students and faculty, and that she thought the university's president should be informed. She remarked that Gettinger must have heard enough about what had happened to know that he should inform the president and that the university should respond

immediately and in a highly visible manner. Because
Gettinger had not yet taken any action, she felt obliged to
raise the issue herself. In the cover letter to Spencer, she
alluded to difficulties with the current leadership of the Art
Department, presumably a reference to Gettinger.

After receiving Mullin's letter, Gettinger contacted James
Butterworth, the Dean of the College. Butterworth told
Gettinger that Mullin's letter had been forwarded to the
president and that Mullin had questioned Gettinger's
competence to run the Art Department in a separate letter
to the president. Gettinger was aware that a group of
faculty in the Art Department was seeking to have him
removed as Chair. Butterworth supported Gettinger as
Chair. In December 1997, Butterworth met with Butts'
parents, apologized, and told them there would be an
investigation. Thereafter, with the approval of President
Spencer and Western Provost Burton Witthuhn,
Butterworth conducted an evaluation of the Art Department
and an investigation into the forum incident. As a result of
the evaluation and investigation, Butterworth issued a
Department Report ("Butterworth Report") on January 20,
1998. The Butterworth Report did not specifically mention
the October 28, 1997 forum, but did allude to allegations of
sexual misconduct and drinking at Art Department events.
The Butterworth Report noted that eight faculty members
supported Gettinger as Chair and seven indicated non-
support. Butterworth recommended to Spencer and
Witthuhn that, among other things, Gettinger continue as
Chair, alcohol was to be eliminated from all future under-
graduate forums or gatherings, and the Chair was to
schedule a meeting to review with all current students the
university's policy on sexual harassment. Moreover, faculty
were to receive a copy of the policy for their records and
compliance. Butts' parents saw the Butterworth Report and
wrote a letter to Gettinger expressing their dissatisfaction.
Gettinger responded with a February 26, 1998 letter telling

them that the university was continuing to review the matter.

Faculty at Western typically were assigned the classes they would teach one year before a semester started. By the time the Butterworth Report was issued, the Spring 1998 semester was already underway and the Fall 1998 classes had already been assigned. Mullin was on sabbatical for the Spring 1999 semester. Thus, Fall 1999 was the first semester following Mullin's letter to Gettinger that Gettinger had an opportunity to assign Mullin's class schedule. For that semester, Gettinger assigned Mullin to teach only entry level courses, contrary to the mix of entry and upper level courses she had previously taught. He also reduced her committee assignments from four to one for the Fall 1999 semester. According to Gettinger, he assigned Mullin to these core, entry level classes because there had been significant turnover in the Art Department faculty and he needed her to cover these classes; he noted that he considered Mullin to be one of his strongest teachers. Other faculty members testified that committee assignments were typically open to anyone who would volunteer for them. On April 14, 1999, Mullin filed a grievance complaining about her assignment to entry level classes and the reduction in committee assignments. She met with Witthuhn and Associate Provost Eric Stiffler to discuss her grievance. At this meeting, Stiffler suggested that Mullin consider retirement as a resolution to her grievance. Mullin, then fifty-nine, replied that she would be happy to retire depending on her benefits. Mullin wanted to retire with her maximum eighty percent annuity benefit.

Thereafter, Mullin requested a report showing her sick leave accrual to date. Mullin feared that accounting errors in her sick leave accrual would result in a reduction of her retirement benefits. In May 1999, Becky Mahr, a human resources officer working in the provost's office generated a computer report ("Mahr Report") showing Mullin's sick

leave accrual and use during her more than thirty years at Western. The system used to track this accrual changed many times between 1967 and 1999 and the Mahr Report appeared to Mullin to contain inconsistencies and errors. When she asked for clarification of her benefits, she was dissatisfied with the responses Witthuhn and Stiffler provided. Stiffler referred her to Nancy Sherer, Western's benefits manager. Sherer was responsible for entering sick leave data into a State University Retirement System ("SURS") program that then calculated certain retirement benefits which were based in part on the employee's unused/unpaid sick leave. Sherer testified that when retiring employees challenged their sick leave calculations, she referred them to Becky Mahr, who was the person in the provost's office responsible for calculating sick days for all employees. Mullin met with Sherer, Mahr, Stiffler and Witthuhn in 1999 to discuss her retirement benefits. The defendants took the position that, under the applicable collective bargaining agreement, Mullin could not accumulate more than 300 days of sick leave. Moreover, the defendants believed that Mullin had not yet met that 300 day limit as of the 1999 discussions. Using Western's calculations, Mullin was not eligible for the maximum 80% retirement benefit in 1999, and did not become eligible for that benefit until March 2002. Mullin believed that she could accumulate more than 300 days of sick leave for the purpose of calculating her retirement benefits and that she had in fact accumulated more than 600 days of sick leave in her many years of service at Western. Unable to reach a satisfactory resolution with Western over her retirement benefits, Mullin worked until 2002 in order to collect the benefits that she believed were due to her in 1999.

On October 18, 2000, Mullin filed suit against Gettinger, Witthuhn, Butterworth and Stiffler, alleging that they retaliated against her for exercising her First Amendment

rights.[1] *See* 28 U.S.C. § 1983. A jury found in favor of all of the defendants, and Mullin filed a motion for a new trial with respect to her retaliation claims against Witthuhn and Stiffler for their failure to correct obvious errors in the calculation of her sick leave and retirement benefits, and their refusal to give her a proper accounting of her benefits. The district court denied the motion and Mullin appeals.

## II.

On appeal, Mullin argues that the district court erred in instructing the jury as follows: "The Court finds as a matter of law that Section 27.7 of the Collective Bargaining Agreement in place at Western Illinois University at the times in question places a limit of 300 on the number of sick leave days that can be accrued." Mullin also contests another jury instruction and several evidentiary rulings made at trial. The defendants counter that the jury instructions were correct, that there were no errors in any evidentiary rulings, and that any errors were harmless because Mullin provided insufficient evidence that Witthuhn and Stiffler harbored the requisite retaliatory motive. We need not address the jury instructions or evidentiary rulings because the defendants are correct that Mullin has provided insufficient evidence of retaliatory intent.

In order to prove her First Amendment retaliation claim, Mullin must show that her speech was on a matter of public concern, and that this protected speech was a motivating factor in the defendants' retaliatory action. *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004); *Klunk v. County of St.*

---

[1] Mullin also alleged certain state law claims which were dismissed before trial. She does not appeal those dismissals and we therefore do not address them.

*Joseph*, 170 F.3d 772, 775 (7th Cir. 1999). A "motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Spiegla*, 371 F.3d at 942. This proof can be met by showing that the protected speech caused, or at least played a substantial part in, the employer's decision to take adverse employment action against the plaintiff. *Spiegla*, 371 F.3d at 943; *Klunk*, 170 F.3d at 775. Once the plaintiff proves that an improper purpose was a motivating factor, the burden shifts to the defendant to prove by a preponderance of the evidence that the same actions would have occurred in the absence of the protected speech. *Spiegla*, 371 F.3d at 943.

The issue here is proof of motivation. Mullin's motivation evidence is insufficient. She relies in part on the timing of the defendants' actions. A plaintiff may demonstrate improper motive with evidence that an adverse employment action "took place on the heels of protected activity." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994). Mullin contends that the 1999 refusal to correct the Mahr Report was the defendants' first opportunity to act against her after she sent the November 1997 letter. Moreover, she urges us to start the clock not in 1997 but rather in February 1998, when Gettinger, with Witthuhn's approval, sent a letter to the Butts family stating that the investigation was continuing. But that February 1998 date is irrelevant; the clock begins when the defendants learned of Mullin's protected speech, and Mullin agrees that Witthuhn and Stiffler learned about her November 17, 1997 letter shortly after she sent it. In any case, the time gap between Mullin's 1997 letter or Gettinger's February 1998 letter and any 1999 action by Witthuhn and Stiffler is too attenuated to provide evidence that Mullin's letter motivated their actions. Witthuhn and Stiffler learned of Mullin's letter at least one year before they took any action against her. Once the grievance process began, they worked with Mullin for

several weeks to resolve her grievance before the sick leave calculation became an issue. Witthuhn and Stiffler had opportunities during that year and during those discussions to retaliate against Mullin if they were so inclined. Instead, they suggested early retirement to Mullin, a solution to which she readily agreed on the condition that her benefits were adequate. This is hardly evidence that the defendants were motivated by retaliation. Moreover, the fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation. *Cromley v. Board of Educ. of Lockport Township High School Dist. 205*, 17 F.3d 1059, 1068 (7th Cir.), *cert. denied,* 513 U.S. 816 (1994). *See also Oest v. Illinois Dept. of Corr.*, 240 F.3d 605, 616 (7th Cir. 2001) (the inference of causation weakens as the time between the protected expression and the adverse action increases thus requiring additional proof of a causal nexus).

The remaining focus of Mullin's retaliation theory seems to be that the Mahr Report was so incorrect that the refusal to fix the numbers must have been motivated by retaliatory intent. But this spin is simply not supported by the evidence. As far as Witthuhn and Stiffler knew, Mahr used the most accurate data available to calculate Mullin's sick leave. Mullin certainly has not presented any evidence casting doubt on the sincerity of that belief. Mahr, Sherer, Witthuhn and Stiffler all believed that they were correctly interpreting the Collective Bargaining Agreement as limiting sick leave accrual to 300 days. The district court also interpreted the contract this way. This interpretation, even if it was incorrect (an issue we need not decide) was not so incorrect as to cast suspicion on the motives of Witthuhn and Stiffler. Mullin argues that she simply wanted Witthuhn and Stiffler to acknowledge to SURS that her sick leave number was possibly incorrect and then let SURS decide how to calculate it. Witthuhn and Stiffler were unwilling to do this, believing it was their responsibility to certify the correct number to SURS. Mullin herself concedes

that the defendants had a statutory duty to certify her sick leave to SURS. *See* 40 ILCS 5/15-113.4. Although Witthuhn and Stiffler did not have complete confidence in the accuracy of the number produced in the Mahr Report, they did not believe that Mullin had more accurate information than that used by Mahr. Again, Mullin has no evidence casting doubt on the sincerity of these beliefs.

We see no way to construe Mullin's evidence as indicative of a retaliatory intent. Mullin's letter was addressed in large part to concerns with the Art Department. Mullin has drawn no connection between persons in the Art Department who may have been offended by her letter and Witthuhn and Stiffler. These two defendants were Western University administrators, far removed from the intrigues of the Art Department. Their role in these events was to suggest retirement as a resolution to Mullin's grievance, and to determine, with the help of their staff, what retirement benefits were due to Mullin. The fact that they may have calculated these benefits incorrectly is not evidence that their errors were motivated by Mullin's protected speech. Mullin suggests that Witthuhn and Stiffler "acted in concert" because they consulted each other on her grievance and sick leave, they both met with Mullin and suggested retirement as a resolution to the grievance, and they both refused to correct the Mahr Report. None of these facts are relevant to the defendants' motivation in refusing to correct any discrepancies in the Mahr Report.

Indeed, Mullin concedes that Witthuhn and Stiffler refused to correct the Mahr Report because they believed it was reliable but then contends that, "The fact that Witthuhn and Stiffler did not get it right when they refused to correct the gross errors in the Mahr Report is determinative on the issue of pretext." Reply Brief at 9-10. Normally we do not consider the issue of pretext until it appears that the adverse action was motivated by an improper purpose, shifting the burden to the defendant to demonstrate that

the action would have been taken even in the absence of the improper motive. Mullin has no evidence of an improper motive and so there is no burden on the defendants to explain their actions. *Cromley*, 17 F.3d at 1068 ("The defendant does not have to prove a legitimate reason for taking adverse action against the plaintiff until the plaintiff has come forth with sufficient evidence to support a *prima facie* case of substantial motivation.") Nonetheless, in the course of discovery and the trial, Witthuhn and Stiffler explained the reasons for their actions. Those reasons are wholly unrelated to Mullin's protected speech. Pretext may be proven with evidence that the defendants' stated reasons for an employment action were factually baseless, were not the actual motivation for the adverse employment action, or were insufficient to motivate the adverse employment action. *Ajayi v. Aramark Bus. Services, Inc.*, 336 F.3d 520, 534 (7th Cir. 2003). None of Mullin's evidence raises a question of fact on the issue of pretext. In short, Mullin has no evidence that Witthuhn or Stiffler were motivated by retaliation. That lack of evidence dooms Mullin's case against Witthuhn and Stiffler.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*