In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 06-4351

GREGORY G. SAMUELSON,

*Plaintiff-Appellant*,

*v.*

LAPORTE COMMUNITY SCHOOL
CORPORATION, KENNETH BLAD,
individually and in his official
capacity as superintendent of
schools, MITCH FEIKES, individually
and in his official capacity as
Trustee, et al.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 05 C 99—**Robert L. Miller, Jr.,** *Chief Judge*.

_____

ARGUED DECEMBER 6, 2007—DECIDED MAY 22, 2008

_____


Before EASTERBROOK, *Chief Judge*, and CUDAHY and
RIPPLE, *Circuit Judges*.

RIPPLE, *Circuit Judge*.  Gregory Samuelson brought this
action under 42 U.S.C. § 1983 in the district court against
LaPorte Community School Corporation ("LSC"). His

complaint alleged violations of the First and Fourteenth Amendments and the Indiana Constitution.[1] After discovery, Mr. Samuelson and LSC filed cross-motions for summary judgment. Mr. Samuelson's response to LSC's motion abandoned his claims under the Fourteenth Amendment and the Indiana Constitution. The district court granted summary judgment on Mr. Samuelson's remaining First Amendment claims. Mr. Samuelson timely appealed.[2] For the reasons stated in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

Mr. Samuelson became a teacher at LSC in 1992. Over the years, Mr. Samuelson also had other duties collateral to his instructional obligations. These duties included service on a technology committee that provided information and recommendations to the Superintendent and School Board, service as the union representative on a hiring committee that recommended candidates for a principal's position, and coaching at both the middle school and high school levels. At least some of these coaching positions were undertaken on the basis of a separate contractual arrangement with LSC. In 2003, the Board declined to renew Mr. Samuelson's contract as coach of the high school girls' varsity basketball team. That decision did not affect Mr. Samuelson's contract as a teacher.

---

[1] The district court had jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1367.

[2] We have jurisdiction over this appeal under 28 U.S.C. § 1291.

**A.**

LSC has a chain-of-command policy. That policy is embodied in LSC's guidelines and bylaws. Guideline 1110, which is entitled "Line and Staff Relations," states:

> All staff members shall be responsible to the Board through the Superintendent. Each shall refer matters requiring administrative action to the person in charge of the department, who shall refer such matters to the next higher authority, when necessary.
>
> Each staff member is to keep the person s/he is immediately responsible to informed of his/her activities by whatever means the supervisor deems appropriate.
>
> All staff members have the right to appeal any decision made by an administrative officer, through approved procedures as defined by contract, agreements, policies, administrative guidelines, or by State law.

R.59.

Guideline 1110A, "Definition of Management Team," states in part:

> The ultimate decision concerning policy in the School Corporation resides by law with the Board of School Trustees under the leadership of the Superintendent of Schools. The management team concept, or shared decision making, is the process by which a recommendation for Board of School Trustees action is developed and the decision implemented.
>
> The management team represents a means of establishing orderly lines of organization and communication as management personnel unite with the Board of Trustees to promote an effective educational program for the students and the community. It is more than an

organizational system since it does establish a climate in which team members are able to experience a feeling of mutual trust, support and a sense of professional dignity.

R.74, Ex. F.

The Guidelines are supplemented by Bylaw 3310, entitled "Freedom of Speech in Noninstructional Settings," which states:

The School Board acknowledges the right of its professional staff members, as citizens in a democratic society, to speak out on issues of public concern. When those issues are related to the Corporation, however, the professional staff member's expression must be balanced against the interests of this Corporation.

In situations in which the professional staff member is not engaged in the performance of professional duties s/he should state clearly that his/her expression represents personal views and not necessarily those of the School Corporation.

R.74, Ex. G.

The record reveals that Mr. Samuelson expressed publically his view on issues related to LSC. In some instances, he addressed his opinions directly to the Board, to individual Board members or to other community members without first addressing those concerns to his supervisor. More precisely, he engaged in four instances of expression that, he contends, motivated the Board to decline to renew his contract as head coach of the girls' varsity basketball team.

First, Mr. Samuelson spoke to the Board about LSC's treatment of the girls' sports programs as compared to the

boys' programs. R.39 at 71-80. Beginning in 1993, Mr. Samuelson spoke with individual Board members, LSC's athletic directors, parents and members of the community about disparities he perceived in the treatment of girls' sports programs. He also objected to the pay of coaches involved in those programs as compared to similar boys' teams. In the same vein, he provided an athletic club at LSC with information that he had obtained from a conference and that may have encouraged the club's subsequent Title IX complaint against LSC in 1995. In 2003, Mr. Samuelson wrote an e-mail to Superintendent Blad requesting information on how to file a Title IX suit against LSC.

Second, in 2000, Mr. Samuelson voiced his disapproval about the LSC's selection and hiring of a middle school principal. R.39. Mr. Samuelson had been appointed to the hiring committee by the teachers' union. The committee recommended that the Board hire Gwen Taylor, but Mr. Samuelson opposed the recommendation. The Board called a special meeting to hear the majority and minority opinions of the committee; at that meeting, he discussed with the Board his reasons against hiring Taylor. He also received phone calls from individual Board members at this time about his opinion and spoke with them about his conclusions.

Third, in the spring of 2002, Mr. Samuelson spoke to Board members about proposed technology changes in the school's computer platform. At the time, he was a serving as a member of the middle school technology committee. He discussed his opposition to the committee's proposal with individual Board members.

Fourth, in 2003, Mr. Samuelson spoke with a Board member, Ruth Minich, about his objections to a proposed school redistricting plan.

**B.**

In 1999, Mr. Samuelson became head coach of LSC's high school girls' basketball team. The team won a Class 4-A sectional championship in 2000, but it faced internal troubles. The season after winning that championship, twenty-eight girls from the basketball program signed a petition requesting that the Board not renew Mr. Samuelson's coaching contract. A second petition containing similar demands was signed by more than 70 representatives of LSC families. Mr. Samuleson refused to resign as coach, and the Board renewed his contract.

There were other problems as well. After a game in January 2003, the middle school girls' basketball coach engaged Mr. Samuelson in a physical altercation: He walked up to Mr. Samuelson and forcibly attempted to drag him off the court and outside of the arena. LSC's athletic director intervened and separated the two men. The day after the incident, every member of the girls' varsity team signed a petition refusing to play under Mr. Samuelson, although they in fact continued to compete. The physical altercation also affected Mr. Samuelson; three weeks later, he was ordered by his physician not to coach because of the stress the incident had caused him.

Early in February 2003, Superintendent Blad asked Athletic Director Gilliland and Principal Handel to provide him with recommendations about the girls' basketball program under Mr. Samuelson. Both men recommended that the Board not renew Mr. Samuelson's contract or the contracts of the assistant coaches. Director Gilliland's evaluation criticized Mr. Samuelson's coaching technique and work ethic. The recommendations primarily focused on (1) the unrest among players, parents and coaches, (2) Mr. Samuelson's poor fund-

raising and unauthorized spending of team funds and (3) his coaching ability.

Superintendent Blad submitted Principal Handel's and Director Gilliland's recommendations to the Board. He also personally recommended that the Board terminate Mr. Samuelson's contract. His memorandum to the Board stated in part that the girls' basketball program was "totally dysfunctional." R.74, Ex. H. It described the "constant series of complaints from players and their parents about Mr. Samuelson" regarding his treatment of players, his lack of organizational skills and his inability to work coopera-tively with his assistant coaches. *Id.* It further stated that Mr. Samuelson "never follows the appropriate chain-of-command and frequently gets himself in trouble by doing things that are outside of the responsibilities of his position (i.e. Purchasing new team uniforms without the permission of the Athletic Director or Principal and without the money to do so.)." *Id.*

Mr. Samuelson declined an invitation to submit a self-evaluation to the Board for consideration along with the other recommendations. On February 14, he e-mailed Superintendent Blad and Assistant Superintendent Adams and asked them about the proper method by which to file a Title IX suit. He also inquired about the remedies available to him if LSC retaliated against him in response to his past and present Title IX complaints.

On February 17, Superintendent Blad composed and transmitted a memorandum to Mr. Samuelson that de-scribed his concerns with Mr. Samuelson's conduct as an employee of LSC. He cited Mr. Samuelson's speaking to newspapers, Board members and private citizens about "harassment" without following the harassment policy procedures. R.60. He also mentioned Mr. Samuelson's

outspoken opposition to the proposed computer plat-
form changes and Mr. Samuelson's failure to first ad-
dress those concerns to the appropriate staff member. *Id.*
Additionally, his memorandum focused on his concerns
about Mr. Samuelson's poor fundraising and excessive
spending, his negative relationship with parents, and his
failure to follow the chain-of-command policy, "specifi-
cally, by calling, visiting, and working behind the scenes
to influence Board member decisions without first dis-
cussing perceived problems with [his] immediate super-
visors" as required by Guideline 1110. R.60 at 1. Superin-
tendent Blad ordered Mr. Samuelson to "comply with
the following directives":

> You will follow the chain-of-command that is out-
> line [sic] in Board policy. That means that should you
> take issue with an administrative directive or experi-
> ence a problem, you will discuss the problem with your
> Department Chair, Principal, Personnel Director
> and/or Superintendent. If you are still unsatisfied
> by the decision, the Superintendent will contact the
> Board and establish a meeting at which time all
> Board members can hear and decide your complaint.
> You **will not** directly contact Board members with-
> out first following the chain-of-command!

R.60 at 2 (emphasis in original). He concluded by
stating that Mr. Samuelson would be disciplined and
possibly terminated if he failed to comply with the direc-
tives. *Id.*

On February 18, 2003, the Board voted unanimously
not to renew Mr. Samuelson's coaching contract. One
Board member, Minich, abstained from the vote. Minich
later told Mr. Samuelson that she believed that the motiva-

tion for his termination came in part from his opposition to the hiring of Taylor as principal, which he had related to the Board in 2000. R.39 at 43-46.

**C.**

On February 17, 2005, Mr. Samuelson filed this section 1983 action against LSC. He alleged four causes of action: that LSC's chain-of-command policy violated his First Amendment rights as an unconstitutional prior restraint; that his coaching contract had not been renewed in retaliation for his speaking out on matters of public importance concerning LSC, also in violation of the First Amendment; that LSC's actions deprived him of due process and the privileges and immunities guaranteed to him by the Fourteenth Amendment; and that LSC's actions had violated his rights under the Indiana Constitution.

Mr. Samuelson moved for partial summary judgment; LSC moved for summary judgment on all claims. In response to LSC's motion, Mr. Samuelson defended only his First Amendment claims. Consequently, the district court determined that Mr. Samuelson had abandoned his claims under the Fourteenth Amendment and the Indiana Constitution by failing to defend them.

With respect to the First Amendment claims, the court granted summary judgment to LSC. It held that Guideline 1110 was not an unconstitutional prior restraint. It further determined that LSC had not retaliated against Mr. Samuelson's exercise of a First Amendment right because, even if some of Mr. Samuelson's speech was protected by the First Amendment and even if LSC

had been motivated partially by Mr. Samuelson's pro-tected speech, Mr. Samuelson had not shown that LSC's stated reasons for the non-renewal were pretextual.

## II

## DISCUSSION

The general principles that guide our review of a case coming to us on summary judgment are well-estab-lished. We review de novo a district court's decision on a motion for summary judgment. *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006). On cross-motions for summary judgment, the court construes facts and draws inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (citation omitted). Sum-mary judgment is appropriate if "the pleadings, deposi-tions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)). We may affirm sum-mary judgment on any ground for which there is sup-port in the record. *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 642 (7th Cir. 2000).

## A.

We first consider whether LSC's chain-of-command policy, Guideline 1110, constitutes a prior restraint. As we noted earlier, this guideline requires staff members to "refer matters requiring administrative action to the person in charge of the department, who shall refer such

matters to the next higher authority, when necessary."
R.59.

The term "prior restraint" is used to describe "administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting Melville Nimmer, *Nimmer on Freedom of Speech*, § 4.03, p. 4-14 (1984) (emphasis added)). A restriction is a prior restraint if it meets four elements: (1) the speaker must apply to the decision maker before engaging in the proposed communication; (2) the decision maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communication; (3) approval of the application requires the decision maker's affirmative action; and (4) approval is not a matter of routine, but involves "appraisal of facts, the exercise of judgment, and the formation of an opinion" by the decision maker. *See SE. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975); *see also Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002); *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940). However, before applying this test to LSC's guideline, we first must determine whether that policy applies to speech that is protected by the First Amendment. *See United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465-66 (1995) ("*NTEU*"); *Crue v. Aiken*, 370 F.3d 668, 678 (7th Cir. 2005). For the restriction to qualify as a prior restraint, the employee must have an interest in the speech as a citizen commenting upon a matter of public concern. *See NTEU*, 513 U.S. at 465-66; *Crue*, 370 F.3d at 678. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amend-

ment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

LSC's chain-of-command policy, when fairly read in its totality, does not constitute a prior restraint because it does not restrict any speech protected by the First Amendment. LSC Guideline 1110 requires staff members to follow the chain of command only on matters "requiring administrative attention," R.59, that is, issues that their job responsibilities require them to report to a supervisor. *See Garcetti*, 547 U.S. at 421, 424. The speech addressed by LSC's chain-of-command policy is speech grounded in the public employee's professional duties and therefore is not protected by the First Amendment. *See id.* at 421-22.

Our understanding of the scope of Guideline 1110 finds support in the language of Guideline 1110A, which establishes that the process for decision making at LSC is one that utilizes a linear chain of command that culminates with the Board. Guideline 1110A "establish[es] orderly lines of organization and communication" for "the process by which a recommendation for Board of School Trustees action is developed and the decision implemented." R.74, Ex. F. Guideline 1110 requires employees to use those "lines of organization," *id.*, by first discussing a matter "requiring administrative action," R.59, with a direct supervisor rather than someone further along the line.

This interpretation of LSC's chain-of-command policy also finds support in the bylaws, including Bylaw 3310, which explicitly acknowledges that staff members may "speak out on issues of public concern" whenever they are speaking as citizens. R.74, Ex. G. The bylaws simply require that, when speaking out about a matter

of public concern not within the professional cognizance of the staff member, the staff member must ensure that he conveys that he is speaking as a citizen and not on behalf of LSC. This requirement hardly limits a staff member's right to speak in public about issues related to LSC. It ensures that, when a staff member does speak about a matter of public interest on which he has no professional responsibility, his views are not attributed to the LSC. When Bylaw 3310 is read in conjunction with Guidelines 1110 and 1110A, it is clear that LSC seeks to restrain only expression related to a staff member's professional responsibilities to the school corporation. The guidelines merely establish a chain of command in order to maintain efficient resolution of issues that an employee's duties require him to address in the course of his employment. Such expression, the Supreme Court has made clear, is not protected by the First Amendment. *See Garcetti*, 547 U.S. at 421-22. Consequently, restriction of that expression cannot constitute a prior restraint. *See NTEU*, 513 U.S. at 465-66; *Crue*, 370 F.3d at 678. The district court properly granted summary judgment for LSC on this claim.

**B.**

We next consider Mr. Samuelson's allegation that LSC retaliated against him for engaging in speech protected by the First Amendment. We apply a three-step analysis in evaluating a First Amendment retaliation claim. *Vukadinovich v. Bd. of Sch. Trs.*, 278 F.3d 693, 699 (7th Cir. 2002). We first determine whether the employee's speech was constitutionally protected. *Id.* If it was, we determine whether the protected speech was a motivating factor for the employer's action. *Id.* If the em-

ployee can show that his constitutionally protected speech was a substantial or motivating factor in his termination, we examine whether the employer can show that it would have taken the same action in the absence of his exercise of his rights under the First Amendment. *Id*.

Mr. Samuelson relies on four instances of expressive activity to support his claim that the Board retaliated against him in violation of his rights under the First Amendment: his statements regarding Title IX and the treatment of the girls' programs, his comments regarding LSC's hiring policies, his statements regarding technology changes at LSC and his discussion with a Board member regarding a possible school redistricting. Even assuming, *arguendo*, that these instances were not a product of his employment duties, and thus were protected by the First Amendment, Mr. Samuelson has failed to show that his nonrenewal as coach was motivated by any of these instances. *See Mullin v. Gettinger*, 450 F.3d 280, 284 (7th Cir. 2006).

Mr. Samuelson has the burden to establish, by a preponderance of the evidence, that protected First Amendment activity was a motivating factor in the nonrenewal of his coaching contract. *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004), *cert. denied*, 128 S. Ct. 441 (2007). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Mullin*, 450 F.3d at 284 (internal quotation marks omitted). Mr. Samuelson can meet this burden by "showing that the protected speech caused, or at least played a substantial part in, the employer's decision to take adverse employment action against" him. *Id.* Once the plaintiff has established that protected expression was a motivating factor, the burden shifts to the defendant

to prove, by a preponderance of the evidence, that the same actions would have occurred in the absence of the protected speech. *Id.* at 285-86.

Mr. Samuelson relies on the timing of the nonrenewal of his coaching contract to demonstrate that the Board's action was motivated by his speech.[3] He notes that he was removed as coach two days after he asked Superintendent Blad in an e-mail about the proper procedure for filing a Title IX complaint and one day after Superintendent Blad ordered him not to speak to Board members without following the chain of command. "A plaintiff may demonstrate improper motive with evidence that an adverse employment action took place on the heels of protected activity." *Id.* at 285 (internal quotation marks omitted). That period begins when the defendant learned of the protected speech. *Id.*

Mr. Samuelson has put forward no evidence that the Board ever saw or considered his e-mail exchange with Superintendent Blad. Although Mr. Samuelson's coaching contract was not renewed just days after that e-mail exchange, there is no evidence of a connection between his speech and the alleged retaliation that makes the timing significant. *Id.* ("[T]he fact that a plaintiff's protected speech may precede an adverse employ-

---

[3] We note for the sake of completeness that Mr. Samuelson cannot rely on the Superintendent's unhappiness with his failure to follow the guidelines with respect to speech that was a product of Mr. Samuelson's employment. As we already have noted, LSC's chain-of-command policy did not constitute a prior restraint; the Superintendent did not violate Mr. Samuelson's First Amendment rights merely by requiring him to comply with that policy.

ment decision alone does not establish causation.”). His motivation evidence is therefore insufficient. *See id.*

Mr. Samuelson also has put forward no evidence that the Board was motivated to retaliate against him by the other incidences of speech upon which he relies. He has not shown that the Board considered any of those incidents. Moreover, standing alone, the timing of Mr. Samuelson’s expressions regarding the technology changes and Taylor’s hiring also cannot suffice to demonstrate that the Board was motivated by those incidents because they occurred more than a year before the Board’s decision. *See id.* (holding that a one-year gap was too attenuated to provide evidence that an employee’s speech was a motivating factor). With respect to his comments on redistricting, only one Board member was aware of his position on that subject, and she abstained from the vote.

Stated simply, the record supports firmly the conclusion that Mr. Samuelson’s contract as coach was not renewed because of the troubled state of the girls’ basketball program. Every Board member who voted on Mr. Samuelson’s coaching contract testified that he or she had no knowledge of Mr. Samuelson’s position on any of the matters about which he claims to have spoken publically. Furthermore, the members stated that the *sole* basis for the Board’s vote was the troubled state of the girls’ basketball program and that the Board did not discuss or consider Mr. Samuelson’s opinions on any other issue. Mr. Samuelson has put forward no evidence contesting these statements or demonstrating that any of the voting Board members even knew that he had spoken out about any possibly protected issues.

In short, Mr. Samuelson has failed to establish that the instances that he claims are protected expression played

a role in the decision of the Board. Consequently, the district court properly granted summary judgment to LSC on Mr. Samuelson's First Amendment retaliation claims.

## Conclusion

Accordingly, we affirm the judgment of the district court.

AFFIRMED