# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 05-4313, 05-4335, 06-1055 & 06-1098

MICHALE CALLAHAN,

*Plaintiff-Appellee,*

*v.*

STEVEN M. FERMON and
DIANE CARPER,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 03 C 2167—**Harold A. Baker,** *Judge.*

ARGUED JANUARY 10, 2008—DECIDED MAY 20, 2008

Before EASTERBROOK, *Chief Judge*, and RIPPLE and
ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Michale Callahan, a former lieu-
tenant with the Illinois State Police, was transferred after
making statements at a meeting about a cold case and
after making official complaints about his superior offi-
cers. In bringing this action under 42 U.S.C. § 1983
against several of his superiors, he claims that he was
transferred in retaliation for speech that is protected by
the First Amendment. The jury found that two of the

defendants, Diane Carper and Steven Fermon, had retaliated against him on the basis of his protected speech and awarded him compensatory and punitive damages. The defendants appealed. While this appeal was pending, the Supreme Court decided *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which held that the First Amendment does not protect a public employee's statements made as part of his official duties. In light of *Garcetti*, we hold that the First Amendment does not insulate Mr. Callahan's statements from employer discipline. Accordingly, the judgment in his favor is reversed, and the case is remanded with instructions to enter judgment for the defendants.

# I

## BACKGROUND

### A.

Michale Callahan was a lieutenant in Zone V of the Illinois State Police ("ISP"). His captain, the head of Zone V, was Steven Fermon. Cpt. Fermon reported to Diane Carper, the commander of several zones including Zone V. Mr. Callahan, Cpt. Fermon and Cdr. Carper all worked in the Department of Operations, the branch of the ISP that contains the patrol and investigative functions. A second branch of the ISP, the Department of Internal Investigation ("DII"), investigates all complaints about misconduct by governmental employees, including complaints brought by citizens and complaints about employees not within the ISP itself.

In the spring of 2000, a private investigator sent a letter to the ISP asking it to review the 1986 murder of Dyke and Karen Rhoads. Mr. Callahan was assigned to

review the matter and to take appropriate action. His examination concluded that there were significant problems with the convictions of Herbert Whitlock and Randy Steidl, the men serving life sentences for the crime.

Through his initial investigation, Mr. Callahan became suspicious that Robert Morgan, a person of interest in the initial Rhoads' investigation who never had been charged, actually might have committed the murders. At the time Mr. Callahan was reviewing the file, Morgan was under investigation by federal authorities for possible drug trafficking and money laundering. Mr. Callahan also learned that Morgan had made significant donations to the political campaigns of both the Illinois Attorney General and the Governor. After Mr. Callahan relayed this information to Cdr. Carper, she ordered him not to continue investigating the Rhoads' murder, but she told him that he could continue to investigate Morgan's possible ongoing illegal activities.

In January 2003, the Deputy Governor called Mr. Callahan at his home and explained that the Governor was considering a grant of clemency for Steidl and Whitlock. He solicited Mr. Callahan's opinion as to whether they were guilty or innocent. Mr. Callahan said that he needed to talk to ISP before he responded. He then called Cpt. Fermon and Cdr. Carper. Cdr. Carper reported the information to her superior, who arranged a meeting at the ISP Academy for the next day in order to discuss the Governor's inquiry. At the all-day meeting, Cpt. Fermon and Mr. Callahan made presentations regarding the convictions of Steidl and Whitlock. They also discussed Morgan's possible criminal activity. Mr. Callahan stated that he thought Steidl and Whitlock were not guilty; he also provided a computer-generated assess-

ment of the homicide that indicated that the two could not have committed the murder.

The relationship between Cpt. Fermon and Mr. Callahan always had been strained, but, in 2003, Mr. Callahan became suspicious that Cpt. Fermon was compromising deliberately the investigation of Morgan. He also began to suspect that Cpt. Fermon might have connections to organized crime. Mr. Callahan discussed his concerns with friends on the task force and former ISP officers. He also began a surreptitious investigation of Cpt. Fermon. In April 2003, Mr. Callahan lodged a complaint with the DII in which he claimed that Cpt. Fermon possibly was involved in misconduct relating to organized crime, and that he possibly had interfered with a federal criminal investigation. He also told DII that Cdr. Carper had ordered him not to pursue the Rhoads' investigation because it was too politically sensitive. Several weeks later he made a second complaint to the DII with substance almost identical to the first. After reviewing the complaints, the DII decided to take no action on them.

The hostility between Mr. Callahan and Cpt. Fermon made Zone V a difficult workplace. Between late 2002 and April 2003, the ISP's Equal Employment Opportunity Office ("EEOO") investigated a hostile-work-environment complaint related to that stress in Zone V. Around the same time that Mr. Callahan filed his DII complaints regarding Cpt. Fermon and Cdr. Carper, the EEOO reported to ISP's upper command that the hostility between Mr. Callahan and Cpt. Fermon was sufficiently serious to warrant action. Cdr. Carper and her superiors met to discuss the problem and determined that they would recommend transferring both Cpt. Fermon and Mr. Callahan out of Zone V. On June 16, that recommenda-

tion was given effect; Mr. Callahan was transferred to the patrol lieutenant position in another district.

**B.**

On September 23, 2003, Mr. Callahan filed a complaint in the district court. He alleged that he had been transferred laterally because of his statements at the ISP Academy meeting and because of the complaints that he had made to the DII in April and May of 2003. At trial, a jury found in favor of Mr. Callahan as to his claims against Cdr. Carper and Cpt. Fermon and awarded him $210,000 in compensatory damages. The jury additionally awarded him $276,700 in punitive damages against Cpt. Fermon and $195,600 in punitive damages against Cdr. Carper. The district court allowed the verdict and compensatory damages to stand, but it ordered the punitive damages reduced to $100,000 against Cpt. Fermon and $50,000 against Cdr. Carper.[1] Cpt. Fermon and Cdr. Carper appealed.

**II**

**DISCUSSION**

The First Amendment, as made applicable to the states through the Fourteenth Amendment, *see Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 707 (7th Cir. 2003), pro-

---

[1] Although Mr. Callahan requested that the court grant him injunctive relief that would restore him to his position in Zone V, the district court did not grant such relief, and Mr. Callahan has not brought the matter to this court by a cross appeal.

tects, under certain circumstances, a public employee's right to speak as a citizen about matters of public concern. *See Garcetti*, 547 U.S. at 420-21. An employer may not retaliate against an employee for engaging in protected speech. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). Under the traditional pre-*Garcetti* two-step test, a public employee's speech received constitutional protection if the employee could establish that (1) he spoke as a citizen on matters of public concern, and (2) his interest as a citizen in commenting upon matters of public concern outweighed the interest of the State as an employer in promoting the efficiency of the public services it performs through its employees. *Sigsworth v. City of Aurora*, 487 F.3d 506, 509 (7th Cir. 2007). Applying this test, the jury determined that Mr. Callahan's speech was protected by the First Amendment.

Since the jury's decision, however, the Supreme Court has provided further guidance as to when a public employee can be considered, for First Amendment purposes, to be speaking as a citizen. In *Garcetti*, the Court held that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421 (emphasis added). *Garcetti* was decided while this case was still open on direct review, and therefore that decision must be given effect in this case.[2] *See Spiegla v. Hull*, 481 F.3d 961, 965

---

[2] Mr. Callahan contends that Cdr. Carper and Cpt. Fermon forfeited their *Garcetti* argument by failing to raise it in the district court. *See Spiegla v. Hull*, 481 F.3d 961, 964 (7th Cir. 2007).

(continued...)

(7th Cir. 2007).

We review de novo whether Mr. Callahan's statements qualify for protection under the standard articulated in *Garcetti*. *See id.* After *Garcetti*, when determining whether a public employee spoke as a citizen, the operative question is whether he made his statements pursuant to his official duties. *Id.* This inquiry is a practical one. *Garcetti*, 547 U.S. at 424. Notably, the Court rejected "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." *Id.* "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424-25. Additionally, the location and audience of the employee's speech are not dispositive; speech may be protected even if it is made by an employee at his place of work to his

---

[2] (...continued)
We cannot accept this argument. Cdr. Carper and Cpt. Fermon moved for summary judgment on the basis that Mr. Callahan's speech was not constitutionally protected "because the speech was a part of his routine duties." R.28 at 24-25; *see also* R.39 at 7 (rejecting the defendants' argument that "Callahan's speech was not protected because he was performing routine job duties as a police officer"). This court has held that a defendant's motion for summary judgment on a *Garcetti*-type ground "was sufficient to preserve the issue for appellate review." *Spiegla*, 481 F.3d at 964. Therefore, Cdr. Carper and Cpt. Fermon did not forfeit their *Garcetti* argument. *See id.*

coworkers. *Id.* at 420. Neither is the subject matter of the speech dispositive; the "First Amendment protects some expressions related to the speaker's job." *Id.* at 421. The controlling factor in the *Garcetti* inquiry is whether the speech "owes its existence to a public employee's professional responsibilities." *Id.*

With *Garcetti* in mind, we turn to Mr. Callahan's claims of First Amendment retaliation. The jury considered two instances of speech in determining that Mr. Callahan had spoken as a citizen: (1) he contended at the ISP Academy meeting that Steidl and Whitlock should be granted clemency; (2) he made two complaints about Cpt. Fermon and Cdr. Carper to the DII. We shall consider each in turn.

Based on the record as a whole, we conclude that Mr. Callahan was speaking pursuant to his official duties—not as a citizen—when he spoke at the Academy meeting. Lieutenants in the ISP routinely are required to attend meetings and to exchange information about investigations. Here, Mr. Callahan was ordered by his superiors to attend the meeting during normal business hours. At the meeting, he advised his employer about the results of his investigation, which he had been ordered to conduct as a public employee with the ISP. He did not speak as a citizen when he attended the meeting; he went to work and performed the tasks that he was paid to perform. *See Garcetti*, 547 U.S. at 422. Like the plaintiff in *Sigsworth*, Mr. Callahan's "speech was part of the tasks he was employed to perform." 487 F.3d at 511. Therefore, "he spoke not as a citizen but as a public employee, and that speech is not entitled to protection by the First Amendment." *Id.*

We also conclude that Mr. Callahan spoke pursuant to his official duties when he twice complained to the DII about Cpt. Fermon and Cdr. Carper. Mr. Callahan stated to his employer's investigative branch his concern that Cpt. Fermon, a captain in the ISP, was involved in unlawful activity and had impeded a criminal investigation. He also alleged that Cdr. Carper had been involved in misconduct by refusing to investigate a crime for political reasons. Mr. Callahan conceded in his deposition testimony and in closing arguments at trial that the ISP rules of conduct require all ISP officers to report misconduct of fellow employees to the DII. That requirement was part of his official responsibility as a police lieutenant. *See Garcetti*, 547 U.S. at 424; *Spiegla*, 481 F.3d at 966. That Mr. Callahan's "statements highlighted potential misconduct by [ISP] officers does not change the fact that [he] was speaking pursuant to [his] official responsibilities, not as a citizen contributing to the civic discourse." *Spiegla*, 481 F.3d at 967 (quotation marks omitted) (final alteration omitted); *see also Morales v. Jones*, 494 F.3d 590, 598 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 931 (2008).

Mr. Callahan did not speak as a citizen at the Academy meeting or when he filed two complaints with the DII because his statements were required by his actual duties as a lieutenant in the ISP. *Spiegla*, 481 F.3d at 969; *see also Garcetti*, 547 U.S. at 424. He therefore has no claim for First Amendment retaliation under section 1983, and the judgment entered in his favor must be reversed.[3] *Spiegla*, 481 F.3d at 966.

[3] As a result of this disposition we need not address the remainder of the appellants' arguments.

**Conclusion**

Accordingly, the judgment of the district court is reversed, and the case is remanded to the district court with instructions to enter judgment for the defendants. The defendants may recover their costs in this court.

REVERSED and REMANDED