In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3298

MILWAUKEE DEPUTY SHERIFF'S ASSOCIATION
and MICHAEL SCHUH,

*Plaintiffs-Appellants,*

*v.*

DAVID A. CLARKE, JR.,
and EILEEN RICHARDS,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06 C 900—**Patricia J. Gorence,** *Magistrate Judge.*

ARGUED FEBRUARY 13, 2009—DECIDED JULY 21, 2009

Before KANNE, ROVNER, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* The dispute in this case is what one's mother might have in mind when she imparts the classic phrase, "Sticks and stones may break my bones, but words will never hurt me." Apparently, Milwaukee County Sheriff David A. Clarke, Jr., did not

take this childhood lesson to heart. In the summer of 2005, Sheriff Clarke posted on a roll-call bulletin board a quote that at least one deputy, Michael Schuh, considered an offensive challenge to his and his fellow officers' courage. Schuh fired back by publishing a two-sentence statement challenging Sheriff Clarke's courage. Sheriff Clarke, apparently afraid that words *would* hurt him, quickly responded by reassigning Schuh to a newly created mission in one of Milwaukee's most crime-ridden neighborhoods.

Deputy Schuh sued Sheriff Clarke, claiming that Clarke retaliated against him for engaging in protected speech in violation of the First Amendment. Schuh also claimed that a recent change to the department's Confidentiality Policy constituted an unlawful prior restraint. We are sympathetic to Schuh's position, and we consider Sheriff Clarke's response against Schuh to be excessive. But there are limits to the First Amendment's protections when a public employee speaks, and because we find that Schuh was speaking on a matter of purely private concern, we agree with the district court that summary judgment in Sheriff Clarke's favor was appropriate.

## I. BACKGROUND

In late May 2005, the Milwaukee County Deputy Sheriff's Association ("MDSA"), which represents deputies and sergeants employed by the Milwaukee County Sheriff's Office, learned that Sheriff Clarke was directing on-duty officers to escort him to and from the Milwaukee airport and to conduct personalized patrols of his home.

Believing the conduct to be an improper personal use of the County's limited resources—particularly during a time when money was tight—MDSA president Roy Felber conveyed the Association's concerns to a reporter from the *Milwaukee Journal Sentinel*. The record is unclear whether the newspaper published a story about the Sheriff at that time.[1]

A few weeks later, Sheriff Clarke posted a quote on a roll-call board at the department, visible to most Sheriff's Office employees. Sheriff Clarke had posted quotations and inspirational messages in the past, but this one had a notably confrontational tone:

> If you are afraid or have lost your courage, you may go home, otherwise you will ruin the morale of others.
>
> Deuteronomy, Chapter 20, Verse 8

One deputy who read Sheriff Clarke's "inspirational" post was Michael Schuh, an eighteen-year veteran officer who was then working as a bailiff. Schuh took offense to Sheriff Clarke's message, believing the Sheriff was per-

---

[1] An initial finding of fact proposed by Sheriff Clarke and Captain Richards stated ambiguously that "[a] story or two appeared in the *Journal* and also reference was made on Channel 12." (Def.'s Prop. Findings of Fact ¶ 115.) The defendants later withdrew this proposed finding as inaccurate, citing a search of a legal database for *Journal Sentinel* articles during the relevant time. Plaintiffs then disputed that there were no stories in the *Journal Sentinel*, but they did not propose an additional finding of fact, nor did they point the district court to any such article.

sonally challenging his own—and his brother and sister officers'—courage to perform their duties.

In response to the Sheriff's quote, Schuh submitted a two-sentence statement to the *Star*, an MDSA newsletter dedicated to publishing news and updates within the Sheriff's Office. The *Star* regularly contained editorials and commentary from deputies, including occasional criticism of Sheriff Clarke. The MDSA distributes the *Star* to approximately 700 current and retired MDSA members, as well as private businesses, sponsors, and the Milwaukee County Board of Supervisors, which controls the Sheriff's budget.

Deputy Schuh's article mirrored Sheriff Clarke's quote from Deuteronomy, with a few additions that Moses never uttered while outside of the Promised Land:

> Union Member's Response:
>
> If you are afraid or you have lost your courage and need two deputies and a sergeant to escort you every time you fly in and out of the airport and patrol deputies to drive by your house when you're out of town you should resign and go home! Then you would lift the morale of this whole department (a.k.a. office).

According to Deputy Schuh, he learned of Sheriff Clarke's use of officers to patrol his home by viewing an order for that assignment on a roll-call board, and news of the Sheriff's personal escorts to the airport arrived through the "grapevine." Schuh testified that he construed the Sheriff's post as a challenge to his courage, and

he wrote his response to "throw back at him what he threw at us." Schuh merely intended to make a sarcastic remark about the Sheriff's courage and did not believe that Clarke was in fact a coward.

On Friday, July 22, 2005, the MDSA distributed the edition of the *Star* containing Schuh's article. Sheriff Clarke, who did not know Deputy Schuh until this incident, was less than pleased by the statement. Later that evening, Clarke called his second-in-command, Inspector Kevin Carr, to discuss an appropriate response.

Clarke settled on reassigning Schuh to a new "Pilot Project," created just for Schuh, that required him to patrol a portion of Milwaukee on foot, in full uniform, and perform various tasks. One objective of the Project was to improve relations with the community, which Schuh would achieve by interviewing residents to determine "what plagues the neighborhood the most" and to "[c]onvince them that we're the good guys/we're on their side and can't succeed without their participation." Another of the stated objectives of the Project was simple: "Visibility." Clarke e-mailed the details of the new assignment to Carr on Saturday, July 23, stating that "We'll identify the census tract. . . . And order him to wear his uniform hat for greater visibility."

Any uncertainty that Sheriff Clarke harbored about where to send Deputy Schuh was resolved the next day, Sunday, July 24, when the *Journal Sentinel* printed a map of a crime-ridden section of Milwaukee's north side. The newspaper characterized the map as the "demographics of a high killing area," described the one-square-mile

neighborhood as "the City's deadliest area," and demar-
cated recent "homicides in Milwaukee's 'hot spot.' " Sheriff
Clarke acknowledged reading the article; the reader
can undoubtedly see where this tale is headed.

When Deputy Schuh arrived at work on Monday, July 25,
he received his plum new assignment. The location to
which Clarke assigned Schuh matched precisely the
boundaries of "the City's deadliest area." Schuh was told
that he must embark on this foot patrol campaign in full
uniform, without a partner, and without a squad car.
And unlike any other officer, he was required to ride a
Milwaukee County Transit bus to and from his new "beat."
He received no advance notice of his reassignment, as
required by the parties' collective bargaining agreement.
Not surprisingly, Schuh viewed the reassignment as
punishment for his statement against Sheriff Clarke.

County authorities and the local media quickly learned
of the Sheriff's conduct. On July 27, two days after
Schuh's reassignment, the Milwaukee County Board of
Supervisors, which oversees the Sheriff's budget, issued
an open letter to the Sheriff. The Board expressed its
"disgust at the reassignment of Deputy Michael Schuh,"
criticized the Sheriff's fiscal irresponsibility and "senseless
approach" to combating violence, and concluded:
"We urge you to reconsider the blatantly shortsighted,
irresponsible, and potentially dangerous move of placing
a Deputy as a one-man foot patrol in the streets." Deputy
Schuh and the MDSA filed a federal lawsuit on the
same day, and the media's focus then shifted to the
litigation.

On July 29, the *Journal Sentinel* published an editorial cartoon depicting Sheriff Clarke (donning the obligatory ten-gallon cowboy hat) pointing a gun labeled "retaliation" at a picture of Deputy Schuh, only to have it backfire in the Sheriff's face, to which the Sheriff exclaims, "I guess I showed him!"

Schuh served on foot patrol for over one month, from July 25 to September 8, 2005. He was equipped with a radio and stated that he was neither afraid nor threatened while performing his duties. Schuh did not lose any pay or benefits during the Pilot Project, and he was eventually granted his request for a transfer.

On July 28, 2005, only three days after reassigning Deputy Schuh, Sheriff Clarke issued Directive No. 13-05, which formally revised the department's Confidentiality Policy. The original Confidentiality Policy was promulgated in 1984, and a revision had apparently been in the works for some time prior to the controversy surrounding Deputy Schuh. Sheriff's Office employees proposed an updated policy in 2002, although the revision was never implemented. In July 2005, Captain Eileen Richards, at Sheriff Clarke's direction, drafted the revised policy, relying in large part on the unimplemented 2002 proposal.

The new policy, which remains in effect, differed only slightly from the old. Rather than requiring employees to "keep departmental business confidential," employees now must "keep official agency business confidential." Employees are prohibited from imparting such information "to anyone except those for whom it is intended, or

as directed by the Sheriff or his designee, or as ordered by law." The new rule also mandates that no one "shall speak on behalf of the" Sheriff's Office unless authorized to do so.

After Sheriff Clarke issued the revised Confidentiality Policy, Deputy Schuh spoke with the media on multiple occasions regarding his reassignment. He was never disciplined or threatened with discipline under the new Policy. In fact, MDSA president Roy Felber was unaware of any employee disciplined under *either* version of the Policy.

The parties agreed to dismiss, without prejudice, the federal lawsuit that Deputy Schuh and the MDSA filed on July 27, 2005, and on October 7, the plaintiffs filed the present suit in Milwaukee County Circuit Court. Schuh and the MDSA alleged violations of Wisconsin state law and, pursuant to 42 U.S.C. § 1983, that (1) the defendants retaliated against Schuh in violation of his First Amendment rights to free speech and association; and (2) the Department's new Confidentiality Policy constituted an impermissible prior restraint. The defendants removed the action to the United States District Court for the Eastern District of Wisconsin on August 17, 2006.

The parties filed cross-motions for summary judgment, and the district court ruled in favor of Sheriff Clarke and Captain Richards on all federal claims. The court declined to exercise supplemental jurisdiction over the state claims and dismissed the action. Deputy Schuh and the MDSA now appeal, and for the reasons that follow, we

agree that summary judgment in defendants' favor was proper.

## II. ANALYSIS

Our guiding principles for reviewing a grant of summary judgment are familiar. We review the district court's decision *de novo* and must reverse if we find that a reasonable jury could have rendered a verdict in favor of the MDSA and Deputy Schuh. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The parties filed cross-motions for summary judgment, and we construe the evidence in favor of the MDSA and Schuh, the parties against whom the motion under consideration was made. *See Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008).

The MDSA and Deputy Schuh raise two issues on appeal: (1) whether Sheriff Clarke violated Schuh's First Amendment rights by reassigning him to the new Pilot Program; and (2) whether the revised Confidentiality Policy constituted an impermissible prior restraint.

### A.  First Amendment Retaliation

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits a public employer from retaliating against an employee for engaging in protected speech. *See Callahan v. Fermon*, 526 F.3d 1040, 1043-44 (7th Cir. 2008). We apply a three-step analysis to a First Amendment retaliation claim under 42 U.S.C.

§ 1983: (1) the employee's speech must be constitutionally protected; (2) the employer's action must be motivated by the constitutionally protected speech; and (3) if the action was retaliatory, we consider whether the employer has demonstrated that it would have taken the same action irrespective of the employee's speech. *Houskins v. Sheahan*, 549 F.3d 480, 489-90 (7th Cir. 2008); *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999).

This case turns on whether Deputy Schuh's speech was constitutionally protected, for there is no question that Sheriff Clarke retaliated against Schuh for publishing his statement in the *Star*. Nor can Clarke claim that he would have taken the same action irrespective of Schuh's speech; he did not even know Schuh before the article appeared. The record is crystal clear that Clarke responded to Schuh's remarks by reassigning him to a dangerous neighborhood on a newly created mission of questionable public utility. Sheriff Clarke hand-tailored the task for Schuh alone, wanted him to be overtly visible, and ordered him to take the bus to his new "beat." In our view, Sheriff Clarke's response was a childish and potentially harmful reprisal for a two-sentence statement, and we do not condone his conduct. Apparently our thoughts are consistent with those of the Milwaukee County Board of Supervisors, the media, and the general public. But Sheriff Clarke's conduct, as irresponsible as it may have been, violated Deputy Schuh's First Amendment rights only if the speech was constitutionally protected, and it is upon that question that we must focus.

The government may not "condition public employment on a basis that infringes the employee's constitution-

ally protected interest in freedom of expression," *Connick v. Myers*, 461 U.S. 138, 142 (1983), but a public employee's right to free speech is not absolute, *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) ("[A] governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public."); *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006).[2] Our goal is "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).

To receive First Amendment protection, therefore, a public employee must speak "as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). If he is not so speaking, the employee has no cause of action for First Amendment retaliation, and we need not balance the employee's interests against the government's interest in promoting effective and efficient public services. *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007). Sheriff Clarke disputed below that Schuh was speaking "as a citizen" by writing his article for the *Star*, but he has conceded this point on appeal.[3]

---

[2]  Sheriff Clarke was also the defendant in *Fuerst*.

[3]  And a wise concession it was. The only connections between Schuh's speech and his employment were that Sheriff Clarke

(continued...)

Because Deputy Schuh was speaking as a citizen, we turn to the central question: whether his statement was "on a matter of public concern." To determine this question of law, we must consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Although no factor is singularly dispositive, we have indicated that the content of the speech is the most important of the three. *See Chaklos v. Stevens*, 560 F.3d 705, 714 (7th Cir. 2009); *Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 409 (7th Cir. 1994).

When examining the "context" of a public employee's speech, the employee's motive for speaking is a relevant consideration. *Cliff*, 42 F.3d at 410; *see also Chaklos*, 560 F.3d at 714; *Miller v. Jones*, 444 F.3d 929, 937 (7th Cir. 2006). After all, "[t]he First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Connick*, 461 U.S. at 145 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). A public employee, familiar with an agency's use of public resources, may be in the best position to raise issues vital to efficient, successful, and legal governance. As the Supreme Court

---

[3] (...continued)
was his superior and that he learned of Clarke's conduct through his position as a deputy. Schuh drafted his statement while off-duty, he reported the conduct externally, and no evidence indicates that the speech was "pursuant to" or "owe[d] its existence to" his official duties. *Garcetti*, 547 U.S. at 421. Consequently, the district court correctly found that Schuh was speaking as a citizen.

has noted, "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers . . . . Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues." *Roe*, 543 U.S. at 82. At its core, then, the First Amendment should protect speech that *intends* to raise such issues.

But a public employee's motive for speaking is not necessarily a dispositive factor, and we have cautioned against creating "an absolute litmus test because [motive] does not supplant content in terms of overall importance to the public concern inquiry." *Cliff*, 42 F.3d at 410; *see also Chaklos*, 560 F.3d at 714; *Miller*, 444 F.3d at 937. Consequently, that a public employee speaks out in part for personal reasons will not necessarily remove the speech from the scope of public concern. *See Phelan v. Cook County*, 463 F.3d 773, 791 (7th Cir. 2006); *Gustafson v. Jones*, 290 F.3d 895, 908 (7th Cir. 2002); *Zorzi v. County of Putnam*, 30 F.3d 885, 897 (7th Cir. 1994) ("'[T]he mere fact that an employer's statement is an outgrowth of his personal dispute does not prevent some aspect of it from touching upon matters of public concern . . . .'" (quoting *Berg v. Hunter*, 854 F.2d 238, 242 (7th Cir. 1988))).

The motive of a statement, rather, "matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee, or if the *only* point of the speech was to further some purely private interest." *Gustafson*, 290

F.3d at 908 (citation and quotations omitted); *see also Button v. Kibby-Brown*, 146 F.3d 526, 529-30 (7th Cir. 1998) ("[S]peech lacks the public concern element if it concerns a subject of public interest but the expression addresses only the personal effect upon the employee." (quotations omitted)). We must analyze the extent that an employee's speech was made for personal reasons in conjunction with the extent to which the content relates to a matter of public concern. *See Metzger v. DaRosa*, 367 F.3d 699, 702 (7th Cir. 2004) (" '[W]here considerations of motive and context indicate that an employee's speech raised a topic of general societal interest merely for personal reasons rather than a desire to air the merits of the issue, . . . these factors militate against the conclusion that the employee's speech is entitled to First Amendment protection.' " (quoting *Campbell v. Towse*, 99 F.3d 820, 827 (7th Cir. 1996))).

With these considerations in mind, we turn to Deputy Schuh's statement, which the district court determined to be a purely personal response to Sheriff Clarke's Deuteronomy quote. First, the form of Schuh's statement weighs in favor of constitutional protection; the *Star* is a labor organization newsletter that is distributed beyond Department employees and dedicated to, *inter alia*, political commentary. The effect of the content and context of Schuh's statement, however, is not as clear.

Regarding the content of Schuh's statement, the district court simply stated "Deputy Schuh's article questioned Sheriff Clarke's personal use of department resources." We interpret this to mean that the court found the

content to be related to a matter of public interest. Indeed, speech protesting government waste is of legitimate interest to the general public. *See Chaklos*, 560 F.3d at 713. But we are less certain that Schuh's article actually spoke to or protested government waste. Again, Deputy Schuh issued the following statement:

> If you are afraid or you have lost your courage and need two deputies and a sergeant to escort you every time you fly in and out of the airport and patrol deputies to drive by your house when you're out of town you should resign and go home! Then you would lift the morale of this whole department (a.k.a. office).

A simple reading of Deputy Schuh's comment indicates that he believed that the Sheriff's need for additional security meant that the Sheriff had "lost [his] courage." Schuh did not comment directly on the department's waste of taxpayer dollars or the impact of the Sheriff's conduct on the availability of officers for more legitimate purposes; our reading of the statement suggests that he focused instead on the Sheriff's lack of courage.[4] Although

_____

[4] Perhaps a county sheriff's lack of courage, in and of itself, may qualify as a matter of public concern, although the MDSA and Schuh have not raised this argument. We do not doubt that the public would feel safer with courageous lawmen, conjuring up visions of Wyatt Earp patrolling Tombstone and prevailing in the shootout at the O.K. Corral, and Elliot Ness leading his band of "Untouchables" in the quest to bring down Al Capone. But given the ambiguity of Schuh's statement

(continued...)

we ultimately agree that the content of Schuh's state-
ment "related to" a matter of public interest, we do not
examine the speech's content in a vacuum, nor do we
rely solely on the express language. We comment on the
content of Schuh's statement merely to note that any
reference to government waste was indirect and
tangential, making the *context* a more important con-
sideration when determining whether the speech was on
a matter of public concern.

After examining the content *and* context of Schuh's
statement, we find that Schuh was speaking on a matter
of purely private concern. The context of the speech,
which includes the circumstances surrounding its pub-
lication and Schuh's motive, indicates that Deputy Schuh
responded to what he considered to be a personal chal-
lenge to his courage by issuing his own personal chal-
lenge to Sheriff Clarke's courage. Sheriff Clarke posted
his initial challenge where it would be widely viewed by
his subordinates; Deputy Schuh published his retort in
a similar forum—an MDSA newsletter distributed to
current and retired officers. Although the plaintiffs
attempt to link Schuh's article to the controversy that
prompted the MDSA to approach the media, nothing
suggests that Deputy Schuh intended to bring to light the
Sheriff's abuse of county resources, to provoke public
discussion about Clarke's conduct, or to air the merits of

---

[4] (...continued)

and considering the remaining analysis, we need not address
this question.

any related dispute. And most importantly, the language
he used in the two-sentence statement does nothing to
further such a purpose. Instead, although Schuh's speech
may have been of general public interest, it focused solely
on "the personal effect upon" Schuh, and "the only
point of the speech was to further some purely private
interest." *Gustafson*, 290 F.3d at 908 (quotations omitted);
*see also Metzger*, 367 F.3d at 702; *Kokkinis*, 185 F.3d at 844.

Deputy Schuh's own testimony reinforces this conclu-
sion. The undisputed facts, based on Schuh's deposition,
state the following: Schuh believed that Sheriff Clarke's
"inspirational message" was challenging his courage to
perform his job; Schuh wrote his article to question
Clarke's courage in return; Schuh was responding to the
quote on the roll-call board and intended to make a
sarcastic comment about Clarke; and Schuh wrote the
article to "throw back at him what he threw at us."[5] We
can find no evidence in the record that supports plain-
tiffs' contention that Deputy Schuh had anything but a

---

[5] The plaintiffs assert that the district court overemphasized this
component of Schuh's testimony, but Deputy Schuh repeated
this phrase three separate times during his deposition. When
asked directly why he wrote the article, Schuh answered, after
an objection by his counsel that the question was asked and
answered, "I wrote the article to throw back at him what he
threw at us. That's my, was—*the whole purpose of the article*."
Further, the plaintiffs did not dispute the defendant's pro-
posed findings of fact on this issue, nor did they propose
any additional finding of fact regarding Deputy Schuh's
motive for writing the article.

personal motive for making his statement.[6] *Cf. Chaklos*, 560 F.3d at 713-14 (holding that speech addressing a private interest within a letter containing matters of public interest was protected and noting that "we have emphasized that speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests" (quotations omitted)).

Our case law supports our determination. The parties and the district court each discussed our decision in *Kokkinis*, and we find that Deputy Schuh's speech here represents an even clearer example of the principles we explained in that case. In *Kokkinis*, the plaintiff, a police officer, appeared on a television news program that was reporting on a fellow officer's allegation of sex discrimination by the police chief. 185 F.3d at 842. Kokkinis commented generally on the police chief's "vindictiveness" and claimed that he made many officers' lives miserable. *Id.* Kokkinis was reprimanded and filed suit, and we held that his speech was unpro-

---

[6] The plaintiffs point to two isolated comments that suggest a broader purpose for Schuh's comments. Schuh stated that he disagreed with using deputies to patrol Clarke's residence "[b]ecause I don't think it serves any purpose." And he later stated that he "might have" used some information from a newspaper in writing his article. Plaintiffs did not highlight these comments before the district court, but even if they had, they do not suggest that Schuh intended to raise a matter of public concern, and the undisputed facts state Schuh's clear purpose for submitting his article.

tected by the First Amendment because, although sex discrimination in the police department is undoubtedly a matter of public concern, he "had a limited interest in speaking on [that] subject," he knew little about the allegations, and he sought "simply to further his own goal of expressing his displeasure with the Chief's policies." *Id.* at 844.

We recently reached the opposite result in *Chaklos*, finding speech by government employees to be protected because it raised matters of both private *and* public concern. 560 F.3d at 713-14. The plaintiffs in *Chaklos* were employed by the Illinois State Police to train forensic scientists; they also owned an independent forensic services company. *Id.* at 709. When the employees discovered that the police awarded a contract for forensic training without a bidding process, they wrote a letter protesting the contract and stating that their company could provide "substantial savings to the State of Illinois." *Id.* We held that even though the employees clearly had a personal motive for drafting the letter—to procure the business for themselves—they nevertheless also intended to highlight that Illinois was wasting money by employing a non-competitive bid process. *Id.* at 713-14. The employees' purpose in speaking was mixed, the letter's content contained matters of public interest, and the speech deserved protection under the First Amendment. *Id.* at 714.

These two cases illuminate the boundary we draw to determine whether speech addresses a matter of public concern, and we find that Deputy Schuh's article falls

on the *Kokkinis* side of the fence. Unlike the letter in *Chaklos*, which contained a matter of public interest because it stated that Illinois was wasting taxpayer money, Schuh's article did not directly question Clarke's fiscal responsibility or raise the public ramifications of Clarke's conduct. Although a reader may interpret the statement this way, the ambiguity in the content makes the context of the speech more important. The record reveals that Schuh made his statement out of a *purely* personal interest, whereas the plaintiffs in *Chaklos* had a mixed motive for writing their letter. And like the plaintiff in *Kokkinis*, who employed a much more public platform for his comments, Schuh's article in the *Star* "was not designed to address a matter of public concern," 185 F.3d at 844, and the content of his speech does nothing to overcome that fact.

The MDSA and Schuh also cite the public controversy surrounding Sheriff Clarke to support their argument that Schuh's speech merits First Amendment protection, whereas the defendants note that there is no evidence of any media story related to Clarke's misuse of deputies. We agree with the MDSA and Schuh on one point: whether the *Journal Sentinel* published an article is not dispositive of whether Schuh was speaking on a matter of public concern. The pivotal question is not the actual presence of public controversy, but whether the speech might inform the public debate on an issue of legitimate interest to the public at the time it is published. *Cf. Zorzi*, 30 F.3d at 897 n.11 (noting that media coverage is not dispositive of public concern and stating that "[i]t is important not to equate the public's curiosity about a

matter with the matter having societal ramifications" (quotations omitted)).

In this case, however, this distinction does not alter our analysis. Although Sheriff Clarke's *retaliation* against Schuh garnered a great deal of media attention, we must still evaluate the full content, context, and form of Schuh's *speech* and determine whether it was on a matter of public concern at the time it was published.

In the end, Schuh cannot avoid that he wrote his short statement, which on its face merely questioned Sheriff Clarke's courage, for purely personal reasons. The plaintiffs argue that the district court "myopically" neglected the full context of Schuh's speech, particularly because it did not connect his article to the MDSA's initial meeting with the press. Had it done so, the plaintiffs claim, the "point" of the speech would have proven largely immaterial. We do not see how this is so. First, the plaintiffs have not produced evidence, apart from timing, that Sheriff Clarke's Deuteronomy posting *was* in response to the MDSA's meeting with the press. But more importantly, adding this to the context does not alter the outcome. Schuh's reference to the Sheriff's misuse of deputies bolstered his challenge to the Sheriff's courage by providing examples of his purported cowardice.

We do not intend to establish the speaker's motive as the determinative factor in a First Amendment retaliation claim. But where, as here, the public component of Schuh's speech was unstated, indirect, and tangential to his primary purpose, which was a purely personal challenge

to the Sheriff, we cannot extend First Amendment pro-
tection. We reach this conclusion after carefully consider-
ing the entire content, context, and form of Schuh's
article. Because we find that Deputy Schuh did not
speak on a matter of public concern, we need not pro-
ceed to the *Pickering* balancing test, and summary judg-
ment in the defendant's favor was appropriate. *See*
*Metzger*, 367 F.3d at 703.

### B.  Prior Restraint

We next consider whether Directive No. 13-05, the
revised Confidentiality Policy issued by the Sheriff's
Office, is an unconstitutional prior restraint. The MDSA
and Deputy Schuh argue that the revised Policy, issued
the day after they filed suit, was a direct response to
the media coverage of Schuh's reassignment and
prevents an employee from divulging "official agency
business" to anyone, including when speaking as a
citizen on matters of public concern. The district court
determined that the Policy was not unlawful, and we
review this decision of law *de novo*.

The predecessor to Directive 13-05 stated that "Members
shall keep departmental business confidential" and
prohibited discussing official information unless directed
by a supervisor or as required by law. The relevant
portion of the new policy reads:

> It is the policy of the Milwaukee County Sheriff's
> Office (MCSO) that all Sheriff's Office employees
> shall keep official agency business confidential.

> They shall not impart it to anyone except those for whom it is intended, or as directed by the Sheriff or his designee, or as ordered by law. No member of the agency shall speak on behalf of the organization unless authorized to do so by the Sheriff or his designee.

The primary changes to the policy are that "departmental business" became "official agency business," and the Sheriff, rather than an employee's supervisory officer, now possesses the authority to direct the dissemination of such information.

Before reaching the merits of the plaintiffs' argument, we first note that they may raise a facial challenge to Directive 13-05 even though neither Deputy Schuh nor any other departmental employee has ever been disciplined for violating it or its predecessor. *See Wernsing v. Thompson*, 423 F.3d 732, 743-44 (7th Cir. 2005) (collecting cases and noting that "government employees whose speech is limited by an internal policy or a pre-clearance directive such as [defendant's] need not seek permission to speak or violate the directive in order to challenge the directive in court"). Thus we address the plaintiffs' claim.

The term "prior restraint" describes "'administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Samuelson*, 526 F.3d at 1051 (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)). The Supreme Court has explained how we are to determine whether a rule constitutes a prior restraint, *see Se. Promo-*

*tions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975), but before any restriction may be unconstitutional, it must apply to speech protected by the First Amendment, *Samuelson*, 526 F.3d at 1052 (citing *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465-66 (1995)).

As we mentioned above, a public employee does not have a protected interest in speech unless he is speaking as a citizen on a matter of public concern. *Garcetti*, 547 U.S. at 421; *Treasury Employees*, 513 U.S. at 466. Whereas our earlier discussion concerned whether speech was "on a matter of public concern," we now examine the "citizen" component of this requirement. Public employees who speak pursuant to their official duties "are not speaking as citizens for First Amendment purposes." *Garcetti*, 547 U.S. at 421. The Supreme Court explained that such speech "owes its existence to a public employee's professional responsibilities," and restricting it "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22. The Court did not articulate a framework for determining whether particular speech arose from one's professional duties, but it stated that the inquiry should be "a practical one" not confined to formal job descriptions. *Id.* at 424-25.

Therefore, before balancing the parties' pertinent interests according to the Supreme Court's opinion in *Treasury Employees*, we must first ask whether Directive 13-05 regulates solely unprotected speech, i.e., that which owes its existence to an employee's duties as a Milwaukee County police officer. *See Crue v. Aiken*, 370 F.3d 668, 678-79 (7th Cir. 2004) (explaining the *Treasury Employees*

balancing test and in what cases it applies). The district court answered this question affirmatively and determined that the Policy was not an unlawful prior restraint. The plaintiffs, however, assert that the Policy impermissibly prevents Department employees from relaying *any* information "related to" official agency business, which extends beyond speech made "pursuant to" or that "owed its existence to" an employee's job duties.

Without question, and as the plaintiffs acknowledge, Directive 13-05's prohibition on employee speech "on behalf of the organization" regulates unprotected speech owing its existence to the employee's professional duties. *See Garcetti*, 547 U.S. at 421; *Callahan*, 526 F.3d at 1044. The real dispute in this case is the extent to which the requirement to "keep official agency business confidential" encompasses speech by an employee as a citizen.

We find that Directive 13-05 is not an unlawful prior restraint because it does not apply to speech protected by the First Amendment. The MDSA and Schuh argue for an expansive interpretation of the phrase "official agency business." They suggest that Directive 13-05 precludes any speech "related to" such business, even though those words do not appear in the Policy itself. We do not read the Policy so broadly. Rather, we find that it regulates only speech "grounded in the public employee's professional duties." *Samuelson*, 526 F.3d at 1052.

The terminology of the Policy, which makes no reference to speech as a citizen, is central to our determination. The Policy covers only "official agency busi-

ness," a phrase containing three separate components. First, the regulated information must be "business," rather than merely a topic of general interest. Of course, a police department's business may be of public interest, but the term at least removes anything tangentially "related to" the department from its coverage. Second, the term "agency" suggests that the business must be generated by or pertain to the Milwaukee County Sheriff's Office. Third, and in our view most importantly, the regulated information must be "official," which typically means either "[o]f or relating to an office or position of trust or authority," or "[a]uthorized or approved by a proper authority." Black's Law Dictionary 1119 (8th ed. 2004). By requiring the regulated speech to be "official," the Policy properly restricts *only* speech grounded in or owing its existence to the employees' job duties. We trust that the Milwaukee County Sheriff's Office will enforce its policy accordingly, as it has done for approximately twenty-nine years; if it does not, it potentially exposes itself to an as-applied challenge to the Policy or a claim for First Amendment retaliation under the *Connick-Pickering* line of cases described above.

To support their claim that Directive 13-05 was intended to squelch speech protected by the First Amendment, the MDSA and Schuh also emphasize that the Directive was issued the day after they filed their lawsuit. We do not deny that this timing is somewhat suspicious. But according to the record, the Sheriff's Office had been considering revisions for a number of years, and no employee has been disciplined under the new or the old

policy. More importantly, the timing does not alter that we must analyze the Policy as a whole and determine whether it regulates protected speech. If the revision was a knee-jerk response to the controversy surrounding Deputy Schuh, it certainly did not stifle criticism from officers, employees, and Schuh regarding the Sheriff's misuse of his authority. Department employees have levied countless criticisms against the Sheriff regarding this controversy and others, both before and after the revision, resulting in no discipline under either version of the Policy.

Last, we are not convinced that vesting the authority to permit dissemination of "official agency business" in the hands of Sheriff Clarke or his designee renders the new Policy unlawful. This change alters from whom an employee must seek permission to speak, but it does not expand the *scope* of the speech governed by the new Policy. The Sheriff is still confined by the Policy and may not restrict constitutionally protected speech made by an employee speaking as a citizen. We are confident that both the purpose and language of Directive 13-05 encompass only speech that "owes its existence to a public employee's professional responsibilities." *Garcetti*, 547 U.S. at 421.

Because the revised Confidentiality Policy regulates only speech not subject to First Amendment protection, the Policy is not an unlawful prior restraint, *see Samuelson*, 526 F.3d at 1052, and summary judgment in the defendants' favor was appropriate.

No. 08-3298

### III. CONCLUSION

We find that Deputy Schuh's statement was not on a matter of public concern, and he cannot sustain his First Amendment retaliation claims. We also find that Directive 13-05 is not an unlawful prior restraint. For these reasons, summary judgment was appropriate for all of the plaintiffs' federal claims, and we AFFIRM.