Matt MOONIN; Donn Yarnall; and Erik Lee, Plaintiffs,

v.

State of NEVADA, ex rel. its DEPARTMENT OF PUBLIC SAFETY HIGHWAY PATROL; Las Vegas Metropolitan Police Department; City of Las Vegas; Clark County; Doug Gillespie, Sheriff; Dave Lewis; John Stewart; Kevin Tice; Thom Jackson; Jim Peterson; Wayne Prosser; Charles Haycox; Brian Sanchez; Hugh Shook; Todd Ellison; Ervin Raab; Ben Leonard; Luis Zapata; Donald Dice; Chris

Perry, individually and in his official capacity; Pat Gallagher; Greg Zeil; Dale Jaeger; Mel English; Tom Higgins; Mark Rispoli; Makor K–9; Does 1–9, inclusive, and Corporations 10–14, Defendants.

No. 3:12–CV–00353–LRH–VCF.

United States District Court, D. Nevada.

April 15, 2013.

Kenneth J. McKenna Reno, NV, for Plaintiffs.

Cameron P. Vandenberg, Office of the Attorney General, Matthew A Deal, Nevada Attorney General's Office, Cynthia R. Hoover, Attorney General's Office, Reno, NV, for Defendants.

## ORDER

LARRY R. HICKS, District Judge.

This is a suit concerning the Nevada Highway Patrol's ("NHP") K9 unit. Before the court are various defendants' motions to dismiss. Defendants Makor K–9 and Rispoli have together filed a Motion to Dismiss (# 31), as have defendants Las Vegas Metropolitan Police Department ("LVMPD") and Zeil (# 32) and defendants Gillespie, English, and Jaeger (# 33). The remaining Nevada state defendants (referred to as "NHP" for reasons apparent below) have also filed a Motion to Dismiss (# 38). Plaintiffs Moonin, Yarnall, and Lee have responded to each motion (## 75, 76, 77, and 72, respectively) and the defendants have all replied (## 82, 84, 83, and 88, respectively).

## I. Facts and Procedural History [1]

This dispute concerns the creation and implementation of a canine drug detection unit ("K9 program") within the NHP. Plaintiffs are officers who were formerly involved in the K9 program.

Plaintiffs allege as follows:

That NHP higher-ups were against the K9 program from the start. When the K9 program finally got off the ground—thanks to the insistence of Nevada's Governor and the Director of the Department of Public Safety—these higher-ups worked to undermine and marginalize it. After Plaintiffs objected to this intentional mismanagement, NHP officials retaliated against them. As a consequence of NHP's efforts, Plaintiffs argue, NHP's K9 program engages in routine Fourth Amendment violations.

Plaintiffs Lee and Moonin are former NHP K9 troopers, and plaintiff Yarnall is the former architect of the NHP's K9 program. Defendants are, for the most part, various NHP officials led by defendant Perry. Plaintiffs allege that the NHP officials expressed their antipathy toward the K9 program in a variety of ways: by shuffling the K9 program from one umbrella department to another in an attempt to destabilize it; by requiring time-consuming and redundant training of the K9 troopers; by springing last-minute busywork on Yarnall; by tampering with Yarnall's written reports to make it seem as if Yarnall were incompetent; by deleting training records from computers; by delaying contractual payments to Yarnall and reimbursements to Lee; by accusing Yarnall of a history of excessive force complaints; by initiating baseless internal investigations; by refusing to investigate

---

**1.** In reviewing a motion to dismiss, the court accepts facts alleged in the complaint as true.

*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Plaintiffs' complaints; by insulting Moonin's dog.

Despite all this, the K9 program initially flourished, yielding impressive drug and currency seizures. The K9 program's success was due in large part to the high training standards Yarnall had implemented—standards he had erected by working longer hours and more days than his contract required.

And so the NFIP officials sought to replace Yarnall's high standards with lower ones. As part of this effort, NFIP officials allegedly filed false complaints against Yarnall and Lee; took files from the K9 program's offices; denied the provision of necessities like dog food; and issued orders barring dogs from the K9 program's offices. They also cried poor when K9 program officers requested resources, despite the fact that the K9 program was funded out of seized currency and despite the fact that the K9 program had seized more than enough money to keep the program going.

In 2009, Lee and Moonin began observing the toll these efforts were having. Attempts to decentralize the program and reduce training standards had led to increased Fourth Amendment violations by K9 troopers. Lee and Moonin alerted NFIP officials to this, but their warnings went unheeded. When, in late 2009, the NFIP officials replaced the K9 program's head with someone more pliable, the K9 troopers submitted a letter to the Director of the Department of Public Safety outlining their grievances.

This letter further roiled the waters. NFIP officials eliminated the K9 troopers' ability to earn overtime; they malingered with respect to renewing Yarnall's contract; they gave Moonin unnecessary tasks.

At the end of 2010, the K9 program's last high-ranking defender, the Director of the Department of Public Safety, retired.

Perry succeeded him as Director and intensified his campaign to ghettoize the K9 program. For example, while Yarnall's contract extension had been assured under the prior Director, Perry decided not to renew Yarnall's contract. Yarnall's employment with NBP ended in March 2011.

In April 2011, Perry split the K9 program into two squads including both NBP officers and LVMPD officers. During the following summer, Moonin observed a marked increase in unconstitutional searches. In particular, Moonin was alarmed at the routine practice of poking holes in packages at a FedEx sort facility so that K9 program dogs could more easily smell the packages' contents. Moonin reported this practice, but his reports did not result in any changes.

While the dogs' nose for drugs failed, the media's nose for news did not. At least five televised interviews with members of NBP and LVMPD occurred over the course of late 2011 and early 2012, centering on the unconstitutional searches and the implosion of the K9 program. Rumors spread that Moonin was the media's source.

Moonin denied these rumors, but they caused him significant grief anyway. NBP and LVMPD employees ramped up their harassment, and Moonin eventually filed a complaint with NBP's Office of Professional Responsibility. Moonin also requested a transfer out of his squad, but his request was ignored.

In September 2011, the NBP's K9 troopers—including Moonin and Lee-resigned en masse from the K9 program. They cited their objections to the training methods as well as the resulting civil rights violations. NBP placed Moonin and Lee in lower-status positions within the NBP, where they remain.

## II. Legal Standard

To survive a motion to dismiss for failure to state a claim, a complaint must satisfy the Federal Rule of Civil Procedure 8(a)(2) notice pleading standard. *See Mendiondo v. Centinela Hospital Medical Center*, 521 F.3d 1097, 1103 (9th Cir.2008). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). The Rule 8(a)(2) pleading standard does not require detailed factual allegations; however, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Furthermore, Rule 8(a)(2) requires a complaint to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference, based on the court's judicial experience and common sense, that the defendant is liable for the misconduct alleged. *See id.* at 678–79, 129 S.Ct. 1937. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678, 129 S.Ct. 1937 (internal quotation marks and citation omitted).

In reviewing a motion to dismiss, the court accepts the facts alleged in the complaint as true. *Id.* (citation omitted). However, "bare assertions . . . amount[ing] to nothing more than a formulaic recitation of the elements of a . . . claim . . . are not entitled to an assumption of truth." *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir.2009) (quoting *Iqbal*, 556 U.S. at 680, 129 S.Ct. 1937) (alteration in original) (internal quotation marks omitted). The court discounts these allegations because they do "nothing more than state a legal conclusion—even if that conclusion is cast in the form of a factual allegation." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

## III. Discussion

Plaintiffs have lodged thirteen claims against Defendants. These claims fall into two broad categories: claims for Plaintiffs' personal harms (First Amendment violations, First Amendment retaliation, state civil conspiracy, conspiracy under 42 U.S.C. § 1985(1), defamation, trespass, state fraud, and unjust enrichment) and claims resulting from the mismanagement of the K9 program (Fourth Amendment violations, failure to train under 42 U.S.C. § 1983, and civil RICO under 18 U.S.C. § 1962). Since Plaintiffs do not have standing to assert the latter claims, however, they cannot recover for the lack of success of the K9 program.

### A. 11th Amendment Immunity

First, the state of Nevada has asserted its Eleventh Amendment immunity. In most cases, a state may not be sued in federal court unless it consents to be sued. U.S. Const. Amend. XI. This immunity applies to state agencies as well as state officials sued in their official capacity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Furthermore, neither

a state nor its officials acting in their official capacities are "persons" under 42 U.S.C. § 1983, and therefore section 1983 does not provide a cause of action against these entities. *Will v. Michigan State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). This last proposition is subject to one exception: where the state official is sued for prospective injunctive relief, the action is properly brought under section 1983. *Wolfe v. Strankman,* 392 F.3d 358, 365 (9th Cir.2004).

■ Here, the state of Nevada and its agency the NHP are immune from suit. Nev. Rev. Stat. ("NRS") § 41.031 (providing that Nevada has not waived its Eleventh Amendment immunity). Furthermore, except for Perry, the complaint does not specify the capacity in which the defendants are sued. Therefore, the court presumes the defendants are sued in their personal capacities. *See Romano v. Bible,* 169 F.3d 1182, 1186 (9th Cir.1999). This presumption comports with the remedies sought (damages) and the defenses raised (qualified immunity). *See Biggs v. Meadows,* 66 F.3d 56, 59–60 (4th Cir.1995) (looking to the "substance of the plaintiff's claim, the relief sought, and the course of proceedings to determine the nature of a section 1983 suit when plaintiff fails to allege capacity"). Finally, Perry is subject to suit in his official capacity because the complaint seeks injunctive relief in the form of reinstatement. *See Wolfe,* 392 F.3d at 365.

### B. Claims Stemming from Mismanagement of the K9 Program

Plaintiffs' claims for violations of the Fourth Amendment, failure to train under section 1983, and civil RICO[2] under 18 U.S.C. § 1962 all stem from the alleged mismanagement of the K9 program.

However, Plaintiffs do not have standing to assert these claims, and these claims consequently fail.

■ All three of these claims revolve around the Fourth Amendment violations that Moonin and Lee observed. But in order to challenge Fourth Amendment violations, the challenger must show that the government has infringed his reasonable expectation of privacy. *United States v. SDI Future Health, Inc.,* 568 F.3d 684, 695 (9th Cir.2009). This means that the Fourth Amendment violation must have been "a violation as to him, personally." *Id.* (quoting *Mancusi v. DeForte,* 392 U.S. 364, 367, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968)).

■ Here, Plaintiffs do not have standing to vindicate the Fourth Amendment rights of the poked-package owners or others unconstitutionally searched. When, in the parties' papers, various defendants have pointed this out, Plaintiffs have responded that they "did not forfeit all constitutional rights by becoming member[s] of a police force." (Plaintiffs' Response # 72 at p. 31:12–13.) Whatever this response means, it falls short of asserting an actionable interest in the subject of the searches and therefore short of alleging a redressable Fourth Amendment violation. And without this, neither the Fourth Amendment claim, *see SDI,* 568 F.3d at 695, nor the failure-to-train claim, *see Bd. of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 400, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (holding that the municipal policy must be a "moving force" behind the violation of *plaintiff's* federally protected right), nor the RICO claim, *Canyon County v. Syngenta Seeds, Inc.,* 519 F.3d 969, 975 (9th Cir.2008) ("A civil RICO

---

**2.** The Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961– 1968.

plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."), will succeed.

### C. First Amendment Claims

Plaintiffs have asserted two different breeds of First Amendment claims: prior restraint claims and a retaliation claim.

### 1. Prior Restraint Claims

Courts evaluate prior restraints of government employee speech through the lens of *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County, Illinois,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *United States v. Nat'l Treasury Employees Union,* 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). *See also Gibson v. Office of Atty. Gen., State of California,* 561 F.3d 920, 926 (9th Cir. 2009). The *Pickering* test requires the court to balance "the interests ... of a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. Thus, *Pickering* balancing only applies to speech made "as a citizen on a matter of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

*Garcetti* addressed the distinction between speech made "as a citizen" and speech made "as an employee." Speech made as an employee is speech that "owes its existence to a public employee's professional responsibilities." *Id.* at 421, 126 S.Ct. 1951. Restricting such speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22, 126 S.Ct. 1951. Thus, if the prior restraint exceeds the scope of regulating speech-as-employee and intrudes on speech-as-citizen, the prior restraint may be subject to

*Pickering* balancing. *See Milwaukee Deputy Sheriff's Ass'n v. Clarke,* 574 F.3d 370, 383 (7th Cir.2009) ("The real dispute in this case is the extent to which the [prior restraint] encompasses speech by an employee as a citizen.").

■ *Pickering* balancing should accord government employers "wide discretion and control over the management of their personal and internal affairs." *Gilbrook v. City of Westminster,* 177 F.3d 839, 867 (9th Cir.1999) (citation and quotation marks omitted). On the other hand, "the more tightly the First Amendment embraces the speech, the stronger the showing of workplace disruption must be." *Id.* (citation and quotation marks omitted). Factors considered in the balancing have included whether the speech "(1) impaired discipline or control by superiors; (2) disrupted coworker relations; (3) eroded a close working relationship premised on personal loyalty and confidentiality; (4) interfered with the speaker's performance of his or her duties; or (5) obstructed routine office operations," as well as "(6) whether the speaker directed the statement to the public or the media, as opposed to a governmental colleague; (7) whether the speaker served in a high-level, policy-making capacity; and (8) whether the statement was false or made with reckless disregard of the truth." *Id.* at 867–68 (citations omitted).

■ Here, Perry's deputy Tice sent an NHP-wide email in February 2011 stating in relevant part:

Effective immediately, except for allied LE [law enforcement] agencies and HIDTA [high intensity drug trafficking area] representatives, there will be NO direct contact between K9 handlers, or line employees with ANY non-departmental and non-law enforcement entity or persons for the purpose of discussing the Nevada Highway Patrol K9 program

or interdiction program, or direct and indirect logistics therein. All communication with ANY non-departmental and non-law enforcement entity or persons regarding the Nevada Highway Patrol K9 program or interdiction program WILL be expressly forwarded for approval to your choice-of-command. Communication will be accomplished by the appropriate manager/commander if deemed appropriate. Any violation of this edict will be considered insubordination and will be dealt with appropriately. (Complaint #1 at ¶188.) As averred in the complaint, Plaintiffs' speech would have addressed the NHP's misuse of funds, encouragement of unconstitutional searches, and the "sabotage" of the K9 program, which are clearly matters of public concern. *See, e.g., Robinson v. York,* 566 F.3d 817, 822 (9th Cir.2009) ("[T]he competency of the police force is surely a matter of great public concern."). The five televised interviews addressing these subjects provide additional support that these subjects are matters of public concern.

Furthermore, Tice's email regulates speech beyond that which "the employer itself has commissioned or created." *Garcetti,* 547 U.S. at 422, 126 S.Ct. 1951. The email restricts "ANY" contact with non-NHP personnel "for the purpose of discussing the Nevada Highway Patrol K9 program or interdiction program, or direct and indirect logistics therein." The focused "any" combined with the prohibition on "discussing ... the K9 program" suggests that this restriction applies to speech merely "related to" the K9 program. *See Clarke,* 574 F.3d at 383. In *Clarke,* the Milwaukee sheriff's employment policy required employees to keep "official agency business" confidential. *Id.* The court held that the composition of "official," "agency," and "business" indicated that the policy only regulated speech "grounded in the public employee's professional duties." *Id.* The court specifically contrasted the regu-

lation of "official" speech—speech "authorized or approved by a proper authority"— with speech "tangentially related to" the department's business. *Id.* The *Clarke* court's implication, of course, is that a prior restraint on the latter category of speech exceeds the government's authority. Tice's email falls squarely within the ambit of this implication. Therefore, Tice's email restricted speech made "as a citizen" on matters of public concern, and *Pickering* balancing is appropriate.

■ Since Defendants have asserted the defense of qualified immunity, however, not just any *Pickering* balancing will do. In a suit against a government official for an alleged violation of a constitutional right, the court must determine early on whether the official is entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled on other grounds by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Qualified immunity is appropriate if the facts, taken in the light most favorable to the plaintiff, show that the officer's conduct did not violate a clearly established constitutional right. *Id.* at 201, 121 S.Ct. 2151. And a right is "clearly established" when "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Because *Pickering* balancing is a "context-intensive, case-by-case" inquiry, "the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Moran v. State of Wash.,* 147 F.3d 839, 847 (9th Cir.1998). That is, in the qualified immunity context, the question becomes whether "the outcome of the *Pickering* balance so clearly favors [Plaintiffs] that it would have been patently unreasonable for [Defendants] to conclude that the First Amendment did

not protect [Plaintiffs'] speech." *Gilbrook,* 177 F.3d at 867 (citation and quotation marks omitted).

On similar facts, the Ninth Circuit found it "clearly established" that "the public's interest in learning about illegal conduct by public officials and other matters at the core of First Amendment protection outweighs a state employer's interest in avoiding a mere potential disturbance to the workplace." *Robinson v. York,* 566 F.3d 817, 824 (9th Cir.2009). In *Robinson,* the plaintiff Los Angeles police officer sued for retaliation after he was disciplined for failing to follow the proper channels of communication in making complaints about department corruption, discrimination and misconduct. *Id.* at 822. The court noted that "[e]ven in a police department, the complained-of disruption must be real and not imagined." *Id.* at 824 (citation and quotation marks omitted). The employer must show "actual injury to its *legitimate* interests." *Johnson v. Multnomah County, Or.,* 48 F.3d 420, 427 (9th Cir.1995). And the employer "does not have a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistleblowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure." *Id.* Finally, the court denied qualified immunity based on an insufficient showing of "disruption" as well as the clearly established law that "[a]n employer's written policy requiring speech to occur through specified 'channels' [is] insufficient to justify retaliation motivated by protected speech." *Robinson,* 566 F.3d at 826 (citing *Anderson v. Central Point Sch. Dist.,* 746 F.2d 505, 506 (9th Cir.1984)).

■■■ If such a policy is insufficient to justify punishment after speech, it is *a*

*fortiori* insufficient to justify a prior restraint of that speech. *See New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (applying a presumption against constitutionality to prior restraints). NHP has offered three justifications for the prior restraint embodied in Tice's "channels" email, none of which are sufficient. First, NHP argues that Tice's email represents NHP's attempt to "resolve inconsistencies" in advance of a legislative hearing on the K9 program. (NHP's Mot. To Dismiss # 48, p. 25.) This rationale was addressed in *Johnson:* NHP does not have a *legitimate* interest in avoiding the disruption that necessarily accompanies whistleblowing. *See* 48 F.3d at 427. Indeed, the public's interest in NHP corruption is at its zenith before a public legislative hearing. *See Gilbrook,* 177 F.3d at 867. Second, NEIP claims that Tice's email simply enforced an NEIP confidentiality policy applicable (with some exceptions not relevant here) to all "information that is not a matter of public record." (NEIP's Mot. to Dismiss # 48, p. 26.) As the *Robinson* court noted, however, an employee's violation of a written policy might strengthen the employer's position in the *Pickering* balance, but it is not alone dispositive.[3] 566 F.3d at 825 (quoting *Connick v. Myers,* 461 U.S. 138, 153 n. 14, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Finally, NEIP contends that a government employer has the right to control its own speech. This is both true and irrelevant. NEIP has advanced no argument suggesting that speech in violation of Tice's directive would have somehow coopted NEIP's speaking platform. *See Downs v. Los Angeles Unified Sch. Dist.,* 228 F.3d 1003, 1013–17 (9th Cir.2000) (holding that a teacher could be prevented from posting

---

**3.** And, moreover, the court has doubts that such a broadly worded policy is itself consti- tutional.

anti-gay material on bulletin boards that school administrators used to communicate with the school's teachers and students).

The *Gilbrook* factors also weigh in favor of Plaintiffs' interest in their protected speech. First, Tice's email restricted only comments to entities outside of law enforcement. Thus, it explicitly prohibited statements directed at the press. In addition, Plaintiffs did not occupy high-level, policy-making positions "for which personal loyalty and confidentiality are indispensable." *Gilbrook*, 177 F.3d at 868. And NEIP has presented no argument that Plaintiffs' statements would have affected their own duties, impaired close working relationships, or obstructed routine office operations. *Id.* The *Pickering* balance therefore weighs in favor of Plaintiffs, and it does so clearly. Accordingly, Tice is not entitled to qualified immunity.

■ On the other hand, Plaintiffs claims against NEIP official Jackson and LVMPD official Zeil both fail. NEIP official Jackson is entitled to qualified immunity. Jackson prohibited Moonin from associating with another trooper. As recounted in the complaint, Jackson told Moonin that he "was not to talk or associate with Bill West up in Reno." (Complaint # 1 at ¶ 224.) Personal communication between two employees at the same level of authority does not typically become speech on a matter of public concern. *See Whitney v. City of Milan*, 677 F.3d 292, 297 (6th Cir.2012) ("[T]o the extent [defendant's] order interfered with [plaintiff's] personal communications with [plaintiff's former co-employee], that speech is not a matter of public concern.") *See also Desrochers v. City of San Bernardino*, 572 F.3d 703, 714 (9th Cir.2009) (noting that the Ninth Circuit has "recognized ... that [a] limited audience weigh[s] against [a] claim of protected speech" and collecting cases). Indeed, Moonin has provided no reason to believe

that the point of speaking to West would be "to bring to light actual or potential wrongdoing." *Connick*, 461 U.S. at 148, 103 S.Ct. 1684.

However, even assuming Jackson's order prevented Moonin from speaking on a matter of public concern, the *Pickering* balance does not "so clearly weigh in favor of [Moonin] that it was patently unreasonable for [Jackson] to conclude that the First Amendment did not protect [Moonin's] speech." *Gilbrook*, 177 F.3d at 870. For example, Moonin's contemplated speech would be directed to a "governmental colleague" rather than "to the public or media." *Id.* at 868. Furthermore, Moonin and West's associational interests implicate "routine office operations," "the speaker[s'] performance of [their] duties," and "coworker relations" in a way that Moonin's prospective statements to outside entities do not. *Id.* And though Moonin asserts an interest in speaking with West on "matters of public concern" like corruption in the K9 program, the complaint suggests that West was already aware of these matters at the time of Jackson's order. (Complaint # 1 at ¶ 224 ("Trooper West contacted command staff regarding the K9 units [sic] shared concern.").) Therefore, Moonin's communiques would not have resembled "good-faith whistleblowing" sufficient to clearly outweigh the government employer's interest in managing its internal affairs. *Robinson*, 566 F.3d at 824 (citation and quotation marks omitted). Therefore, Jackson is entitled to qualified immunity.

■ In contrast to the claim against Jackson, Plaintiffs' claim against LVMPD official Zeil does not even warrant *Pickering* balancing. Plaintiffs allege that, at a September 2011 meeting, Zeil stated that "narcotics detailed is a covert mission" and forbade "all K9 officers from discussing 'our business' with anyone outside the unit." (Complaint # 1 at ¶ 250–51.)

These comments lack the effectiveness of either Jackson or Tice's order, suggesting that they do not effect a prior restraint at all. Unlike Tice's order, Zeil's comments did not subject "the enjoyment of protected expression ... [to] the approval of government officials," *Baby Tam & Co., Inc. v. City of Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998). Nor did Zeil's comments threaten punishment. They were issued orally, upon one occasion, in what Plaintiffs admit was a spirit of "warning." (Plaintiffs' Response #76, p. 11:12.) Warnings differ from commands in ways salient to the application of the First Amendment: while commands presume the speaker's authority over the hearer, warnings do not. And without real or presumed authority, Zeil could not have implemented an actual restraint on Moonin's expression.

Most importantly, even if Zeil's comments did enact a prior restraint, this restraint swept more narrowly than Tice's email in its prohibition of speech. Zeil prohibited the discussion of "our business" with outside entities, regulating "only speech grounded in the public employee's professional duties." *See Clarke,* 574 F.3d at 383 (quoting *Samuelson v. LaPorte Cmty. Sch. Corp.,* 526 F.3d 1046, 1052 (7th Cir.2008)). Since this type of speech is not speech made as "[a] citizen[ ] for First Amendment purposes," *Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951, Zeil's prohibition is not subject to *Pickering* balancing. Plaintiffs claim against Zeil thus fails as a matter of law.

**2. First Amendment Retaliation Claim**

Plaintiffs' First Amendment retaliation claim also fails as a matter of law. The sketch of a First Amendment retaliation claim under 42 U.S.C. § 1983 includes protected speech, an adverse employment action, and causation between the two. *Coszalter v. City of Salem,* 320 F.3d 968, 973 (9th Cir.2003). In the Ninth Circuit, this sketch is fleshed out into five ques-

tions: (1) Did the plaintiff speak on a matter of public interest? (2) Did the plaintiff speak as a private citizen or as a public employee? (3) Was the plaintiff's protected speech a substantial or motivating factor in the adverse employment action? (4) Did the state have adequate justification for treating the employee differently from other members of the general public? (5) Would the state have taken the adverse employment action even absent the protected speech? *Eng v. Cooley,* 552 F.3d 1062, 1070 (9th Cir.2009).

 Plaintiffs' complaint falters on the first three prongs—prongs on which Plaintiffs bear the burden. *Eng,* 552 F.3d at 1070–71. Plaintiffs allege that they (1) "reported widespread unconstitutional searches, improper officer behavior ... and the many negative impacts of implementing lower training standards," (2) "discussed malfeasance" regarding the K9 program's funding, and (3) "discussed the frustration, interference, and sabotage of the K9 Program." (Complaint #1 at ¶ 387.) However, coming on the heels of almost eighty pages of factual recitation, Plaintiffs' retaliation claim fails to identify the "form and context" of the speech at issue, *Connick,* 461 U.S. at 147, 103 S.Ct. 1684, rendering it impossible to discern which speech gave rise to which acts of retaliation. This failure not only deprives Defendants of the ability to suss out speech made as an employee from speech made as a citizen, *Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951, but it also undermines any causal connection between the speech and the alleged retaliatory acts. Therefore, Plaintiffs have failed to state a prima facie case of First Amendment retaliation.

**D. State Civil Conspiracy**

 Plaintiffs have failed to plead a conspiracy with an unlawful objective. "An actionable civil conspiracy consists of

a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Consol. Generator-Nevada, Inc. v. Cummins Engine Co., Inc.,* 114 Nev. 1304, 971 P.2d 1251, 1256 (1998) (quotation marks and citation omitted). The alleged conspiracy's objective here was to "force the constructive resignation of the Plaintiffs and/or destroy the K9 Program and Plaintiffs' positions within the program." (Complaint # 1 at ¶ 434.) However, while the mismanagement of the K9 program is a wrong demanding political redress, it is not a wrong warranting legal redress. Nor is Plaintiffs' "constructive termination" unlawful absent some reason to believe the termination worked an independent tort. *See Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety,* 121 Nev. 44, 110 P.3d 30, 51 (2005), *abrogated on other grounds by Buzz Stew, LLC v. City of North Las Vegas,* 124 Nev. 224, 181 P.3d 670 (2008). Since Plaintiffs have not provided such a reason, they have failed to state a claim for civil conspiracy under Nevada law.

### E. Federal Conspiracy under 42 U.S.C. § 1985(1)

Section 1985(1) prevents a conspiracy to interfere with "any person ... holding any office ... under the United States." "The clear import of this language is that the statute's protections extend exclusively to the benefit of federal officers." *Canlis v. San Joaquin Sheriff's Posse Comitatus,* 641 F.2d 711, 717 (9th Cir.1981). Plaintiffs do not dispute that they are state, not federal, officers. Therefore, this cause of action fails.

### F. Defamation

 In Nevada, the plaintiff bears the burden of proving four elements in a defamation claim: "(1) a false and defamatory statement; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Clark County School District v. Virtual Education Software, Inc.,* 125 Nev. 374, 213 P.3d 496, 503 (2009). However, the defendant bears the burden of proving that a publication is "privileged." *Pope v. Motel 6,* 121 Nev. 307, 114 P.3d 277, 284 (2005). Privileged publications include intra-agency communications that occur "in the regular course of the [agency]'s business." *Id.* (quoting *Simpson v. Mars Inc.,* 113 Nev. 188, 929 P.2d 966, 968 (1997)). However, the abuse of the intra-agency privilege effects its waiver. "A conditional privilege may be abused by publication in bad faith, with spite or ill will or some other wrongful motivation toward the plaintiff, and without belief in the statement's probable truth." *Circus Circus Hotels, Inc. v. Witherspoon,* 99 Nev. 56, 657 P.2d 101, 105 n. 2 (1983) (citing *Gallues v. Harrah's Club,* 87 Nev. 624, 491 P.2d 1276, 1277 (1971)).

Here, Plaintiffs have alleged five separate defamatory statements. Defendants have asserted both truth and privilege as defenses. While privilege may be a successful defense at the motion to dismiss stage, the defense of truth requires the court to make judgments of credibility. The latter task is not native to this stage of the litigation. Therefore, Defendants will succeed on their motions to dismiss only to the extent their defense of privilege succeeds.

 With respect to three of the alleged defamatory statements, Plaintiffs have successfully pleaded abuse of the intra-agency privilege. First, Plaintiffs allege that Perry defamed Yarnall by stating that Yarnall had been sued repeatedly for excessive force and other civil rights violations. (Complaint # 1 at ¶ 484.) Perry

made this statement to his superior prior to Yarnall's hire, and Perry's superior then initiated an investigation. Since Perry had potential supervisory authority over Yarnall, and since the circumstances of this statement indicate it was made for the legitimate department purpose of investigating a potential hire, this statement falls within the intra-agency privilege. However, Plaintiffs have also alleged that this statement was made "with either knowledge of [its] falsity or with reckless disregard of [its] truth." (*Id.* at ¶ 486.) While "bare assertions … amount[ing] to nothing more than a formulaic recitation of the elements of a … claim … are not entitled to an assumption of truth," *Moss,* 572 F.3d at 969, Plaintiffs have pleaded sufficient animus on the part of Perry against the K9 program and its affiliates to raise a plausible claim that Perry abused the intra-agency privilege. Plaintiffs have therefore stated a claim of defamation against Perry.

■ Similarly, Plaintiffs allege that NHP official Lewis defamed Yarnall and Lee by claiming that they were planting drugs during traffic stops. While this statement is eligible for protection by the intra-agency privilege, Lewis's animus against the K9 program suggests that he may have abused this privilege, as Plaintiffs have alleged.

■ Third, NHP official Peterson allegedly defamed Moonin by stating that Moonin's dog "Teko" had no role in the seizure of drugs or money in one particular case. Defendants allege that dogs cannot be defamed, and therefore that the statement does not constitute defamation. "A statement is … defamatory if it would tend to lower the subject in the estimation of the community, excite derogatory opinions about the subject, and hold the subject up to contempt." *Pegasus v. Reno Newspapers, Inc.,* 118 Nev. 706, 57 P.3d 82, 88 (2002) (citation and quotation marks

omitted). Here, Plaintiffs have alleged that Peterson's statement was reasonably understood to impugn Moonin's skill as a dog handler. Therefore, Plaintiffs have successfully stated a defamation claim against Peterson. *See Keller v. City of Reno,* 587 F.Supp. 21, 23 n. 5 (D.Nev.1984) ("The plaintiffs need not have been specifically named in the address if it is found that defendant['s] remarks could reasonably be understood as applying to them.").

■ The remaining defamation claims fail because the alleged defamatory statements are not, in fact, defamatory. Plaintiffs allege that Tice told a Department of Public Safety Information Officer that the K9 program resembled the infamous Los Angeles Police Department Rampart Division. This statement, interpreted in context, is one that a reasonable person would interpret as "mere rhetorical hyperbole," and therefore it is not actionable in defamation. *Pegasus,* 57 P.3d at 88. Plaintiffs insist this statement is defamatory because Tice did not preface his statement with "in my opinion," but this insistence ignores the context in which the comments were made. *Id.* As alleged in the complaint, the comparison between the Rampart Division and the K9 program focused on the program's decentralized command. (Complaint # 1 at ¶ 138.) In the context of this focus, other potentially defamatory implications—that the K9 program was akin to a criminal organization—are clearly hyperbolic in the view of a reasonable interpreter. Therefore, Tice's statement is not defamatory.

■ Finally, Plaintiffs allege that Perry singled out Moonin as the source of the leaks to media outlets regarding NFIP's illegal and corrupt activities. This statement is not defamatory since such an accusation would not "tend to lower the subject in the estimation of the community, excite derogatory opinions about the subject, [or]

hold the subject up to contempt." Rather, "in the estimation of the community," this type of whistleblowing is laudable. Since "it is not one's reputation in a limited community in which attitudes and social values may depart substantially from those prevailing generally which an action for defamation is designed to protect," *see Saunders v. Bd. of Directors, WHYY–TV (Channel 12)*, 382 A.2d 257, 259 (Del.Super.1978), Perry's identification of Moonin as a whistleblower was not defamatory.

### G. Trespass

To sustain a trespass action, Plaintiffs must show that a property right was invaded. *Lied v. Clark County*, 94 Nev. 275, 579 P.2d 171, 173 (1978). No property right was invaded if the invader was acting pursuant to a privileged right of entry. *See Winchell v. Schiff*, 124 Nev. 938, 193 P.3d 946, 952 (2008). However, when a person exercises his privilege to enter land unreasonably, that person is liable for the harm caused by the unreasonable conduct. Restatement (Second) of Torts § 214 (1965).

Here, Plaintiffs allege that NHP official Zapata intentionally entered plaintiff Lee's land without authorization, causing damage in the process. After Lee resigned his assignment with the K9 program, the NHP demanded the return of Lee's dog's kennel, which Lee kept at his house. Lee had installed the dog kennel in his backyard with a crane, and Lee told the NHP that they would have to remove it with a crane. Instead, Zapata and other NHP officers destroyed Lee's backyard fence in order to remove the kennel. (Complaint # 1 at ¶ 318.) Lee later filed a police report.

Plaintiffs have successfully alleged a trespass claim against Zapata. Zapata responds that his entry onto Lee's land was privileged because Lee wrongfully prolonged his possession of the NHP's kennel. Even if this is true, however, the destruction of Lee's property raises a question of fact as to whether Zapata's entry was "reasonable," Restatement (Second) of Torts, *supra*, § 198, and whether it exceeded the scope of Zapata's privilege. Therefore, Plaintiffs' trespass claim survives the motion to dismiss.

### H. Nevada Fraud

Plaintiffs allege that NHP official O'Rourke defrauded Yarnall by promising that his contract would be renewed when, in fact, O'Rourke knew that it would not be. Since O'Rourke is not a named defendant in this action, this claim fails.

### I. Unjust Enrichment

"Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is 'acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Certified Fire Prot. Inc. v. Precision Constr.*, —— Nev. ——, 283 P.3d 250, 257 (Nev.2012) (citation omitted). However, "[a]n action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 113 Nev. 747, 942 P.2d 182, 187 (1997).

Here, Plaintiffs' unjust enrichment claim centers on the uncompensated time and effort Yarnall spent on the development of the K9 program. However, Plaintiffs have alleged that Yarnall had a valid written contract with NHP, and they are therefore barred from lodging an unjust enrichment claim under *Leasepartners*.

### J. Nevada Anti–SLAPP and *Noerr–Pennington* Doctrine Defenses

■■ NHP has raised Nevada's anti-SLAPP law and the *Noerr–Pennington* doctrine as defenses. Nevada's anti-strategic lawsuit against public participation ("anti-SLAPP") statute, NRS § 41.635 *et seq.,* provides that a defendant may bring a special motion to dismiss within sixty days after service of the complaint if the complaint is "brought against a person based upon good faith communications in furtherance of the right to petition." NRS § 41.660. "Communications in furtherance of the right to petition" include communications to an officer of a governmental entity that reasonably concern the governmental entity. *John v. Douglas County Sch. Dist.,* 125 Nev. 746, 219 P.3d 1276, 1286 (2009). And "good faith communications" are communications that are truthful or made without knowledge of falsehood. *Id.*

In light of the court's decision above, NHP's argument that Nevada's anti-SLAPP statute bars Plaintiffs' state law claims applies only to the defamation claims.[4] The conditional privilege applicable to the defamation claims—intra-agency privilege—mimics the definition of "communications in furtherance of the right to petition," at least with respect to governmental entities. *See Pope,* 114 P.3d at 284 (defining intra-agency communications as communications that occur "in the regular course of the [agency]'s business"). However, this privilege only applies where it has not been abused, and abuse is defined as "publication in bad faith ... without belief in the statement's probable truth." *Circus Circus,* 657 P.2d at 105 n. 2 (citation and quotation marks omitted). That is, the intra-agency privilege is abused where the communications are not in

"good faith" for the purposes of Nevada's anti-SLAPP statute.

■■ Therefore, as relevant here, the anti-SLAPP statute and the intra-agency privilege apply to Plaintiffs' claims to the same extent. Since Plaintiffs have successfully alleged the abuse of the intra-agency privilege with respect to certain defamation claims, they have successfully questioned whether certain Defendants' statements were "good faith communications." Consequently, Nevada's anti-SLAPP does not bar the defamation claims to a greater extent than does the intra-agency privilege.

Finally, NHP argues that the *Noerr–Pennington* doctrine warrants dismissal of all Plaintiffs' claims. The *Noerr–Pennington* doctrine is the federal analogue to the anti-SLAPP statute, protecting "those who petition any department of the government for redress" from "statutory liability for their petitioning conduct." *Theme Promotions, Inc. v. News Am. Mktg. FSI,* 546 F.3d 991, 1006 (9th Cir.2008). Here, however, Defendants' potential liability is not premised on any protected petitioning activity. *See id.* at 1007 (discussing protected lobbying activity). Therefore, the *Noerr–Pennington* doctrine is inapplicable.

### K. Leave to Amend

Plaintiffs have requested leave to amend in the event their complaint is found wanting. It is, and they are granted leave to amend. Federal Rule of Civil Procedure 15(a)(2) provides that a court "should freely give leave [to amend] when justice so requires." And "justice so requires" in most cases, since the Rules favor "an opportunity to test [ ] claim[s] on the merits." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). There-

---

**4.** Most of Plaintiffs' state law claims have not survived the various motions to dismiss for failure to state a claim, and Plaintiffs' surviving trespass claim does not address speech.

fore, Plaintiffs are entitled to amend their complaint.

## IV. Conclusion

Plaintiffs' First Amendment claim against Tice, three of their defamation claims, and their trespass claim have survived Defendants' motions to dismiss. The other claims have not.

IT IS THEREFORE ORDERED that Makor K–9 and Rispoli's Motion to Dismiss (# 31) is GRANTED.

IT IS FURTHER ORDERED that LVMPD and Ziel's Motion to Dismiss (# 32) is GRANTED.

IT IS FURTHER ORDERED that Gillespie, English, and Jaeger's Motion to Dismiss (# 33) is GRANTED.

IT IS FURTHER ORDERED that NHP's Motion to Dismiss (# 38) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Plaintiffs are granted leave to amend their complaint, provided that the amended complaint does not exceed thirty (30) pages and provided the amended complaint is filed within twenty (20) days of the date of this order's filing.

IT IS SO ORDERED.